# NO. 12-14-00254-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *NEURODIAGNOSTIC TEX, L.L.C.,* *APPELLANT* | § | *APPEAL FROM THE 7TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *ROBERT "JOSH" PIERCE AND* *SYNERGY IOM, LLC,* *APPELLEES* | § | *SMITH COUNTY, TEXAS* |

## *OPINION*

Neurodiagnostic Tex, L.L.C. (NeuroTex) appeals the trial court's orders granting summary judgment in favor of Appellees Robert "Josh" Pierce and Synergy IOM, L.L.C., as well as its orders pertaining to NeuroTex's other pretrial motions relating to summary judgment proceedings. NeuroTex raises six issues on appeal. We affirm in part and reverse and remand in part.

## BACKGROUND

On December 13, 2005, NeuroTex and Pierce entered into an employment agreement.[1] Pursuant to the agreement, NeuroTex agreed to employ Pierce primarily to provide intraoperative testing/monitoring (IOM) services on its behalf.[2] The agreement set forth that Pierce initially would be employed for a ninety day duration and for thirty day periods thereafter. The agreement further permitted either party to terminate it by giving fourteen days written notice of an intention not to renew employment for the following calendar month. However, the agreement also described

---

[1] The agreement states that it is effective as of November 1, 2005.

[2] IOM comprises testing the brain, spinal cord, or nervous system to prevent damage during a surgical procedure. An IOM technician applies electrodes to a patient and performs tests during the surgery. If the testing indicates a patient could become paralyzed, the surgeon is informed, who can remove any problematic hardware or implants prior to causing permanent damage. IOM may also aid the surgeon by determining neurologic structures that cannot be determined visually due to distortion of the patient's anatomy.

circumstances under which NeuroTex could terminate Pierce's employment for cause. Moreover, the agreement contained a noncompetition agreement, which stated, in pertinent part, as follows:

### VII. NON-COMPETITION AGREEMENT

Employee acknowledges that Company is agreeing to spend financial resources to train Employee pursuant to the Training Agreement below and share proprietary and confidential information with Employee so that Employee will be capable of satisfying Employee's duties under this Agreement. Further, Company agrees to provide Employee with a fourteen (14) day notice of termination of Employment, unless Employee is terminated for cause as described earlier in this Agreement . . . .

#### 1. Non-Disclosure Agreement

Employee and Company agree that, in the course of Employee's employment with Company, Employee will acquire confidential customer and patient related information that could damage Company if this information were to come into the possession of Company's competitors. For this reason, and for the protection of the Company's patients, Employee will not, except as authorized in writing by Company, during or at any time after the expiration or termination of this Agreement, directly or indirectly, use, communicate, divulge, furnish to, or convey to any other person, firm, or corporation, any of the trade secrets, financial information, project plans, or other proprietary or confidential information of Company or any of Company's subsidiaries, partners, associates, or affiliates, obtained by Employee during the term of this Agreement. The information Employee agrees not to disclose includes, but is not limited to, the following:

a. Identity and information regarding any past, present, or prospective customer or patient of Company;

b. Any financial information of any of Company's business;

c. Any list of Company's employees, whether permanent or temporary; and

d. Any results of any studies or investigations by Company or Employee conducted during the term of this Agreement.

. . . .

#### 4. Covenant Not to Compete

Employee agrees that the covenants and restrictions set forth below are intended only as a reasonable protection of the Company. For a period of five (5) years after the expiration or termination of this Agreement, Employee shall not, either directly or indirectly, become engaged in any business or activity in the Texas counties surrounding the Dallas/Fort Worth Metroplex, which are Collin, Dallas, Denton, Ellis, Hood, Johnson, Kaufman, Parker, Rockwall, Tarrant, and Wise counties located in the State of Texas, which directly or indirectly competes with the Company's business owned or operated by Company or any of Company's subsidiaries, partners, associates, or affiliates, unless approved by Company in writing before Employee's acceptance of such employment or opportunity.

Employee shall not have any contact with any of Company's current customers or contacts or solicit potential customers if such potential customers are or were identified through leads developed during the course of Employee's rendering of services and duties under this Agreement.

2

Employee shall not, either during the term of this Agreement or for a period of two (2) years thereafter, divert or attempt to divert any existing or future business of Company. Employee shall not, either during the term of this Agreement or for a period of two (2) years thereafter, either directly or indirectly, for himself or any third party, solicit, induce, recruit, or cause another person in the employ of any business owned or operated by Company to terminate his/her employment for the purpose of joining, associating, or becoming employed with any business which is either in competition with Company or that conducts or performs intraoperative testing/monitoring (IOM) services.

. . . .

### 7. Representations of Employee

Employee represents that Employee's experience and capabilities are such that the restrictions contained herein will not prevent Employee from obtaining employment or otherwise earning a living at the same general economic benefit as reasonably required by Employee and that Employee has, prior to the execution of this Agreement, reviewed this Agreement thoroughly with Employee's legal counsel, if needed or desired.

### VIII. TRAINING AGREEMENT

As part of this Agreement, Company and Employee agree that Company is prepared to expend large sums of money and invest considerable amounts of time to train, educate, and qualify Employee to (1) either become board eligible in preparation of the evoked potential and intraoperative monitoring boards or to become board eligible to provide evoked potential testing/intraoperative monitoring (IOM) services, (2) to become registered as an REPT, and (3) to become registered as CNIM. Employee acknowledges that he has already become boarded in EEG. Employee and Company agree that the cost of the training to be provided to Employee is Five Thousand and NO/100 Dollars ($5,000.00). In consideration of the covenants and agreements contained herein, Employee and Company agree to the following:

### 1. Company's Advancement of Training

Company will advance the cost of training to train, educate, and qualify Employee to (1) either become board eligible in preparation of the evoked potential and intraoperative monitoring boards or to become board eligible to provide evoked potential testing/intraoperative monitoring (IOM) services, (2) to become registered as an REPT, and (3) to become registered as a CNIM, all of which shall hereinafter be referred to as "Training."

### 2. Service Period

Company will be unable to realize the full value of the Training provided to Employee under this Training Agreement unless Employee successfully completes the Training described above and continues to provide services for the Company for a reasonable period of time. Therefore, if Employee resigns, otherwise voluntarily terminates employment with Company, or is discharged for cause pursuant to Section VI at any time during the Training period or within forty-eight (48) months of full time employment following Employee's board eligibility date ("Service Period"), Employee will repay Company the sum of Five Thousand and NO/100 Dollars ($5,000.00), with interest at a rate of eight (8) percent per annum from the date of termination of employment with Company, in cash upon the date of termination.

. . . .

### 8. "At Will" Employment Status

This Training Agreement shall not be interpreted as a promise by Company to employ Employee for any length of time. This Training Agreement shall not be interpreted as a change of Employee's status from an "at will" employee.

Thereafter, NeuroTex paid for Pierce's training, both in-house and by third parties. By May 2006, Pierce had received two additional board certifications. After having become triple board certified, Pierce continued to work for NeuroTex for another seven years. During that time, he performed IOM services at various hospitals in the Dallas/Fort Worth area. On or about October 15, 2013, Pierce tendered his resignation to NeuroTex and, subsequently, began working for Synergy as an IOM technician.

On December 23, 2013, NeuroTex filed the instant suit against Pierce for breach of covenant not to compete and breach of fiduciary duty and against Synergy for tortious interference with contract. NeuroTex further sought, and was granted, a temporary injunction against Pierce. Synergy and Pierce filed both no evidence and traditional motions for summary judgment, in which they argued that the covenant not to compete was unenforceable.[3] Synergy further argued that NeuroTex could not recover against it on its tortious interference claim. Pierce also contended that NeuroTex could not recover against him for breach of fiduciary duty. NeuroTex responded[4] and, ultimately, the trial court granted Synergy's and Pierce's respective motions for summary judgment, ordering that NeuroTex take nothing on its causes of action. This appeal followed.[5]

## SUMMARY JUDGMENT STANDARD OF REVIEW

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant who conclusively negates at least one essential element of the nonmovant's cause of action is entitled to summary judgment as to that cause of action. *See* *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Likewise, a defendant who conclusively establishes each element of

---

[3] Pierce adopted and incorporated Synergy's motion for summary judgment into his own motion for summary judgment.

[4] In addition to its response, NeuroTex filed special exceptions to Pierce's and Synergy's respective no evidence motions for summary judgment, moved to strike Synergy's supplemental summary judgment evidence, and moved to continue the submission date on Synergy's and Pierce's respective motions for summary judgment claiming an inadequate time for discovery. The trial court denied the special exceptions, the motion to strike, and the motions for continuance.

[5] Pierce sought leave to file summary judgment on the issue of its entitlement to attorney's fees under the statute. However, the trial court refused to grant him leave. In its subsequent ruling on the parties' postjudgment motions, the trial court stated that its orders granting summary judgment were final judgments.

an affirmative defense is entitled to summary judgment. *Id.* Once the movant has established a right to summary judgment, the nonmovant has the burden to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). The only question is whether an issue of material fact is presented. *See* Tex. R. Civ. P. 166a(c).

Additionally, after an adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. *See* Tex. R. Civ. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged evidence. *See Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 317 (Tex. App.–Houston [1st Dist.] 1999, no pet.). We review a no evidence motion for summary judgment under the same legal sufficiency standards as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). A no evidence motion is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See id.* at 751. If the evidence supporting a finding rises to a level that would enable reasonable, fair minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Id.* Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact, and the legal effect is that there is no evidence. *See id.*

When reviewing traditional and no evidence summary judgments, we perform a de novo review of the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *See Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). We are not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits and other summary judgment proof. *See Gulbenkian v. Penn*, 252 S.W.2d 929, 932 (Tex. 1952); *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 508 (Tex. App.–Tyler 2008, pet. denied).

Further, all theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* Tex. R. Civ. P. 166a(c). If the trial court's order granting summary judgment does not specify the grounds relied on for its ruling, we will affirm it if

any of the theories advanced are meritorious. ***State Farm Fire & Cas. Co. v. S.S.***, 858 S.W.2d 374, 380 (Tex. 1993).

Lastly, when a party moves for both a traditional and a no evidence summary judgment, we first review the trial court's summary judgment under the no evidence standard of Rule 166a(i). *See* ***Ford Motor Co. v. Ridgway***, 135 S.W.3d 598, 600 (Tex. 2004). If the no evidence summary judgment was properly granted, we do not reach arguments under the traditional motion for summary judgment. *See* ***id.*** However, this rule is not absolute. *See* ***Dunn v. Clairmont Tyler, LP***, 271 S.W.3d 867, 870 (Tex. App.–Tyler 2008, no pet.). In this case, our disposition of the covenant not to compete issue is, in part, dispositive of the tortious interference issue, but was raised only by a traditional motion for summary judgment. *See* ***id.*** Therefore, we will address the covenant not to compete issue first.

<u>COVENANT NOT TO COMPETE</u>

In its fourth issue, NeuroTex argues that the trial court erred in granting Pierce's and Synergy's motions for summary judgment because NeuroTex's summary judgment evidence established that the covenant not to compete is enforceable as a matter of law.

**Governing Law**

The enforceability of a covenant not to compete agreement is a question of law. ***Powerhouse Prods., Inc. v. Scott***, 260 S.W.3d 693, 696 (Tex. App.–Dallas 2008, no pet.); *see also* ***Gorman v. CCS Midstream Servs., L.L.C.***, No. 12-09-00204-CV, 2011 WL 1642624, at *3 (Tex. App.–Tyler 2011, no pet.) (mem. op.). Likewise, what constitutes sufficient consideration for a contract is generally a question of law, but can be a question of fact. ***Burges v. Mosley***, 304 S.W.3d 623, 629 (Tex. App.–Tyler 2010, no pet.) (question of law); ***Roark v. Stallworth Oil and Gas, Inc.***, 813 S.W.2d 492, 496 (Tex. 1991) (holding factual questions remained on consideration issue in summary judgment case due to failure to produce conclusive proof).

A covenant not to compete is enforceable if it is (1) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) reasonable, not imposing a greater restraint than is necessary to protect the goodwill or other business interest of the employer. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a) (West 2011). The first element can be broken down into two inquiries: (1) whether there is an "otherwise enforceable agreement," and (2) whether the covenant not to compete is "ancillary to or part of" that agreement at the time the otherwise

6

enforceable agreement was made. *See **Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding***, 289 S.W.3d 844, 849 (Tex. 2009).

**"Otherwise Enforceable Agreement"**

With regard to the first inquiry, "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory. *Id.* Moreover, a unilateral contract formed when an employer performs a promise that was illusory when the contract was formed can satisfy the requirements of the statute. *See **Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson***, 209 S.W.3d 644, 651 (Tex. 2006). Thus, when an employer makes an illusory promise of consideration and, later, performs in accord with the promise, the consideration is no longer illusory. *See **id.***

In the instant case, pursuant to the employment agreement between NeuroTex and Pierce, NeuroTex agreed to employ Pierce as an IOM technician, and each party agreed to provide the other fourteen days advance notice of intent to terminate the agreement. Furthermore, NeuroTex promised to provide certain training for Pierce, and Pierce, in return, promised to work for NeuroTex for forty-eight months following his becoming board certified or to reimburse NeuroTex the sum of $5,000.00. The record conclusively establishes that NeuroTex provided Pierce with training and paid for Pierce to receive third party training to prepare him to receive two additional board certifications. Moreover, the record conclusively establishes that Pierce continued to work for NeuroTex for more than seven years after becoming triple board certified. Thus, we conclude that the employment agreement in this case qualifies under the statute as an "otherwise enforceable agreement."

**"Ancillary to or Part of" an Otherwise Enforceable Agreement**

Concerning the second inquiry, for a covenant not to compete to be "ancillary to or part of" an otherwise enforceable agreement, the employer must establish both that (a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement. *See **Marsh USA Inc. v. Cook***, 354 S.W.3d 764, 775 (Tex. 2011). "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." ***Sheshunoff***, 209 S.W.3d at 651. The consideration from the employer "must give rise to the employer's interest in restraining the employee from competing." *Id.* at 648–49. Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of

7

protection by a covenant not to compete. *See, e.g.*, *Marsh USA Inc.*, 354 S.W.3d at 777; *Sheshunoff*, 209 S.W.3d at 651; *Lazer Spot, Inc. v. Hiring Partners*, 387 S.W.3d 40, 46 (Tex. App.–Texarkana 2012, pet. denied); *Gallagher Healthcare Ins. v. Vogelsang*, 312 S.W.3d 640, 652 (Tex. App.–Houston [1st Dist.] 2009, pet. denied).

In the instant case, the summary judgment record indicates that Pierce possessed an EEG certification before he began work for NeuroTex. Pursuant to the agreement, NeuroTex promised to train him and, in fact, did provide training for him, both in-house and externally through board certification exam preparatory courses. Following this training, Pierce received two additional board certifications—REPT and CNIM.

Synergy and Pierce argue that this training was not an interest worthy of protection because, among other reasons, there was nothing confidential or proprietary about it. But the fact that this training consisted of information that may have been available to any member of the public who sought it out is not the issue.

"Specialized" training is training that "concentrate[s] on a particular activity or product" or training by which a person is "develop[ed] so as to become adapted to a specific environment or function." THE AMERICAN HERITAGE DICTIONARY 1172 (2nd College Ed. 1982). The definition of the word "specialized" does not indicate that the information or methods imparted to the employee must be confidential or proprietary. *See id.* But neither does it include the type of training that is commonplace or typical in an industry. *See id.*; *see also, e.g., Lazer Spot, Inc.*, 387 S.W.3d at 49 n.15 (citing *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 231 (Tex. App.–Texarkana 1998, no pet.) (general skills and knowledge, i.e., "housekeeping functions," developed through course of employment not types of interests that justify protection under restrictive covenant)).

Here, Pierce was hired to perform particularized job duties. Indeed, Pierce testified that the field in which he works is a "specialized field." The record indicates that the EEC certification Pierce possessed before he signed the agreement permitted him to hook patients up to the monitoring equipment in a clinical setting, but not in an operatory setting. The summary judgment record reflects that NeuroTex expended its resources for Pierce to receive training and knowledge, which enabled him to receive two additional board certifications. As a result, he was qualified to apply his skillset in an operatory setting. Moreover, he was better at performing his job than he otherwise would have been had he not received these two additional certifications.

Cathy Boldery testified that there were only three hundred triple board certified IMO technicians in the United States, six of whom, including Pierce, worked for NeuroTex. Pierce

testified that one of the reasons that he went to work for NeuroTex was because Cathy Boldery, who he knew provided this sort of training nationwide, would be training him. What is more, Pierce testified that once he had received the additional training, which permitted him to become triple board certified, he "pretty much could do it all." But if there was ever a question pertaining to a particular type of procedure, he could contact Boldery and additional information would be made available to him.

As the court noted in **Sheshunoff**,

> [S]ection 15.50(a) does not ground the enforceability of a covenant not to compete on the overly technical disputes . . . over whether a covenant is ancillary to an otherwise enforceable agreement. Rather, the statute's core inquiry is whether the covenant "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise. Concerns that have driven disputes over whether a covenant is ancillary to an otherwise enforceable agreement—such as the amount of information an employee has received, its importance, its true degree of confidentiality, and the time period over which it is received—are better addressed in determining whether and to what extent a restraint on competition is justified.

**Scheshunoff**, 209 S.W.3d at 655–56 (citations omitted).

We must construe the summary judgment evidence in a light most favorable to NeuroTex. *See **Sudan***, 199 S.W.3d at 292. Having done so, we conclude that the training NeuroTex provided to Pierce was "specialized" training, thereby qualifying it as an interest worthy of protection. We note that in reaching this conclusion, we do not determine generally what the level of training must be to qualify as "specialized" for purposes of being an interest worthy of protection. Our conclusion is limited to the specific facts of this case.

<u>*"Designed to Enforce the Employee's Consideration or Return Promise in the Agreement"*</u>

Next, we consider whether the effect of the covenant was to prevent the employee from breaching the promise he gave as consideration in the separate agreement. *See **Fielding***, 289 S.W.3d at 852 (covenant not to compete designed to prevent employee from using confidential information to compete with employer); ***Ireland v. Franklin***, 950 S.W.2d 155, 158 (Tex. App.–San Antonio 1997, no writ) (covenant not to compete designed to enforce employee's promise not to disclose trade secrets).

In the instant case, the summary judgment evidence supports that NeuroTex expended well in excess of Pierce's stated reimbursement amount of five thousand dollars in conjunction with Pierce's training and board certification exams. Thus, it is reasonable to conclude that NeuroTex had an interest in realizing the value of its expenditure of money and time to train Pierce by having

9

Pierce continue as its employee for a certain period of time. It is doubtless that it was of particular importance to NeuroTex that its competitors be prevented from hiring Pierce away from them soon after it had expended such efforts to train him to a high degree. Therefore, there is a clear nexus between the covenant's effect of preventing Pierce from competing with NeuroTex by utilizing the specialized training he received to benefit a future employer. We conclude that the covenant not to compete was designed to enforce Pierce's consideration or return promise in the agreement.

## Reasonableness of Limitations

NeuroTex further argues that the restraints are reasonable, but asserts in the alternative that the trial court erred when it failed to reform the covenant and enter an injunction to enforce the covenant in accordance with the reformed limitations.

To prove a breach of a covenant not to compete, the employer must show that the covenant's limitations on time, geographic area, and scope of activity are reasonable. *See* TEX. BUS. & COM. CODE ANN. §§ 15.50(a), 15.51(c) (West 2011); *Marsh USA, Inc.*, 354 S.W.3d at 771. Whether a covenant's limitations are reasonable is a question of law. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).

If a covenant is ancillary to an otherwise enforceable agreement, but is found to impose a greater restraint than necessary, the covenant is not invalidated; instead the court must reform the covenant to make the restraint reasonable. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c); *Marsh USA*, 354 S.W.3d at 778. However, when a covenant not to compete is not necessary to protect the employer's legitimate business interests, it cannot be reformed. *See Daytona Grp. v. Smith*, 800 S.W.2d 285, 290 (Tex. App.–Corpus Christi 1990, writ denied). A party waives its right to reformation if reformation is not timely requested. *See Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, 263 S.W.3d 232, 251 (Tex. App.–Houston [1st Dist.] 2007), *rev'd on other grounds sub nom.*, *Fielding*, 289 S.W.3d 844.

In the instant case, NeuroTex, in its live pleadings, broadly stated "if the covenant is not enforceable to the fullest extent provided, Plaintiff requests the Court enforce such covenant to the extent provided by law." NeuroTex further set forth in its response to Pierce's no evidence motion for summary judgment as follows:

> Lastly, although Plaintiff believes the covenant is enforceable as written, it is seeking to enforce the restriction on employment only to the extent it encompasses counties where Pierce actually worked when he was employed by Plaintiff and for those doctors and hospitals. This modification of the enforcement does not make the restriction unenforceable as drafted. Even if the covenant [is] unreasonable, which Plaintiff denies, Section 15.51(c) of the Texas Business and

Commerce Code specifically allows for reformation of the geographical area of an otherwise enforceable agreement.

Moreover, although Synergy did not specifically ask for reformation in its motion for summary judgment,[6] its argument that the covenant not to compete is unenforceable because it contains unreasonable limitations falls short of an argument that the covenant is wholly unnecessary to protect the employer's legitimate business interests.

Ordinarily, when a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *See S.S.*, 858 S.W.2d at 380. However, we are mindful that a trial court may not grant summary judgment on grounds not expressly asserted in the summary judgment motion. *See Nat'l City Bank of Ind. v. Ortiz*, 401 S.W.3d 867, 876 (Tex. App.–Houston [14th Dist.] 2013, pet. denied).

Here, (1) NeuroTex and Pierce specifically requested reformation of any unreasonable restrictions[7] and (2) Pierce did not argue that the covenant is wholly unnecessary to protect the employer's legitimate business interests.[8] Moreover, there is no indication from the record that the trial court undertook to reform any restrictions it found to be unreasonable. Thus, we hold that in granting Pierce's summary judgment and ordering that NeuroTex take nothing, the trial court granted relief beyond that which was expressly asserted in Pierce's summary judgment motion.

It is apparent from the grounds raised in the summary judgment proceedings and the trial court's orders granting summary judgment that the trial court did not consider the issue of whether the restraints in the covenant not to compete were reasonable. We do not decide whether the agreement is reasonable as to time, scope of activity, and geographical area. *Cf. Marsh USA*, 354 S.W.3d at 778. If the trial court determines that any particular provision is unreasonable or

---

[6] We mention Synergy's motion because it was adopted by and incorporated into Pierce's motion.

[7] We recognize that Pierce had the right to assert alternative grounds in his summary judgment motions. *See* TEX. R. CIV. P. 48, 166a(b), (c); *see also, e.g.*, *A.P. Keller, Inc. v. Cont'l Airlines, Inc.*, No. 14-10-00917-CV, 2011 WL 5056241, at *3 (Tex. App.–Houston [14th Dist.] Oct. 25, 2011, no pet.) (mem. op.).

[8] The lion's share of Synergy's argument in its motion, which was adopted by Pierce, was that the covenant was unenforceable because the restrictions were unreasonable. Indeed, Synergy acknowledges in its reply to NeuroTex's response to its motion for summary judgment that NeuroTex possibly could obtain reformation of the agreement. Nonetheless, we note that Synergy, in concluding its argument in its motion for summary judgment, makes a perfunctory assertion that "the covenant contains geographic restrictions and activities that are unreasonable and unnecessary to protect any interest that Plaintiff might have." Having carefully considered the overall thrust of its argument, we decline to conclude that such a cursory statement, without more, sufficiently raised to the trial court the distinct argument that the covenant was wholly unnecessary to protect the employer's legitimate business interests.

11

overbroad, it has the authority to reform the agreement and enforce it by injunction with reasonable limitations. *Id.* (citing TEX. BUS. & COM. CODE ANN. § 15.51(c)); *Sadler Clinic Ass'n, P.A. v. Hart*, 403 S.W.3d 891, 898 (Tex. App.–Beaumont 2013, pet. denied) (where trial court did not reform contract, court of appeals remanded to trial court for initial determination of reasonableness of restrictions); *see also Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.,* 414 S.W.3d 911, 920 (Tex. App.–Houston [1st Dist.] 2013, no pet.) (reformation pursuant to Section 15.51 is remedy to be granted at final hearing, whether on merits or by summary judgment). Accordingly, we will remand this matter to permit the trial court to make the initial assessment of whether the limitations in the covenant not to compete are reasonable and, if they are not, reform the agreement as necessary. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c); *Marsh USA*, 354 S.W.3d at 778.

NeuroTex's fourth issue is sustained in part and overruled in part.[9]

## TORTIOUS INTERFERENCE WITH CONTRACT

In its sixth issue, NeuroTex argues that the trial court erred when it granted Synergy's no evidence motion for summary judgment with regard to its tortious interference cause of action because it presented sufficient summary judgment evidence to support each of the challenged elements of that claim. To prove a cause of action for tortious interference with contract, the plaintiff must satisfy the following elements: (1) the plaintiff had a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; and (4) the plaintiff incurred actual damage or loss. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

### Breach Proximately Caused Injury/Damages

Synergy argued in its motion that there is no evidence that any hospital or surgical center assigned one fewer case to NeuroTex as a result of Pierce's leaving its employ. Stated another way, Synergy argues that NeuroTex has no evidence that Pierce's breach proximately caused it any injury or damages.

In its response to Synergy's motion for summary judgment, NeuroTex first argues that Pierce entered into an agreement to perform intraoperative monitoring services for Synergy, a direct competitor owned in part by Alford, its former customer. Thus, Synergy contends, "it is logical to assume that Synergy received payment and profits that, otherwise, would have gone to NeuroTex."

---

[9] *See* n.12.

12

There is no dispute that Pierce entered into an agreement to perform IOM services for Synergy, which competes with NeuroTex. Nor is there any dispute that Alford is a part owner of Synergy. However, at her deposition, Boldery clarified the nature of NeuroTex's business when she testified, in pertinent part, as follows:

Q. Just so I don't forget later on, do you have any current contracts with hospitals where they have contracted with other entities or individuals to do intraoperative monitoring?
A. I'm certain that there are.

Q. Okay.
A. I don't know exactly which ones.

Q. At the time that you started your business, was there anyone out there already doing intraoperative monitoring as a business?
A. When I first started, there were only a few in the Metroplex. Now there's lots.

. . . .

Q. So, you would contract with the hospital to perform the services, but then the customer is the doctor who would order the service, correct?
A. Customer is not the doctor.

Q. Who is - -
A. Customer is the hospital.

Q. Customer is the hospital[?]
A. Correct.

Q. Okay.
A. In fact, the customer really - - customer is not really a good word. I suppose that the recipient of the service is really several people. It's the patient. It's the hospital. You know, the surgeon is obviously a recipient of the service, but it's the hospital that pays us. You know, the surgeon can order the service, but we can't go into the facility without permission from the hospital, without privileges approved by the hospital. We've had several situations where hospital - - the surgeons have ordered the services but the hospitals won't allow us access.

So, you know, the surgeon really isn't the customer. Now, he's an aspect of the service and he has to order - - just like a prescription, he has to order our services, but really the recipient of the services is the hospital, the patient. And[,] obviously[,] the surgeon has to order the service, but he can order it as much as he wants, but unless we have a contract with the hospital and obtain privileges, we can't go in.

. . . .

Q. So do you or do you not have contracts with doctors?
A. No contracts.

Q. No contracts. Okay. So the doctor is free to contact whomever has a contract with the hospital to do the intraoperative monitoring?
A. Not necessarily.

Q. Okay. What did I get wrong, if you could explain it to me? What did I say wrong?
. . . .

13

A. We are not always contacted by the surgeons to perform the service.

. . . .

Q. Okay. If a physician chooses not to call you, they would still, as far as you know, need to call someone that has a contract with that hospital to show up and do the monitoring at that particular hospital.
A. That's not how it works.

Q. Okay. How does it work?
A. Orders are sent to the hospital just like an X-ray. If they need a microscope, if they need - - whatever they need for surgery, the orders are sent to the hospital.

Q. So the physician's office contacts the hospital and says we need to do - -
A. All these things. I need all these things for surgery.

. . . .

Q. And the hospital contacts you . . . to come perform the intraoperative monitoring?
A. Yes.

Q. So you - - do you know how the hospital chooses which one pursuant to whatever - - how many contracts they have? If they have three contracts, how do they pick one to come do the work?
A. I don't know.

Q. Okay. So does the physician, if you know, does the physician, when they contact the hospital, does the physician say I want to use you or they want to use another company?
A. I don't know.

Q. You don't know[?]
A. No.

Q. You don't know how it originates?
A. I know that the hospital tells us when they need monitoring.

Q. So the hospital contacts you and then you have a scheduler that then schedules someone to show up and do it?
A. Yes, sir.


Furthermore, concerning NeuroTex's lost profits, Boldery testified at her deposition, in pertinent part, as follows:


Q. I'm talking about dollars, real dollars as to what came in, what expenses went out, and to indicate a damage. But you would be able to give him documents to indicate a damage from your company? Not interested in Synergy at all, just your company, damage that you would claim.
A. I would follow the advice of my attorney.

Q. But today you don't know of any damage other than being able to tell me about the potential?
A. In general[,] we talked about some of the things, in general.

Q. In general.
A. In general[,] the loss of the cases from Dr. Alford. We talked about that.

14

Q. And that you blame on Mr. Pierce?
A. He went to work for Dr. Alford.

Q. I understand that, but - -
A. We were doing cases for Dr. Alford up until the time he went to work for Dr. Alford. As much as - - well, in September, August, August 15th was the last time we did a case, and he left in October and then there were no more cases. And we did cases all of 2013.

Q. All of 2013 for Dr. Alford?
A. Um-hum, sporadically we did, yes. Not consistently on a regular basis, two and three times a week. We didn't do all of his cases, but we obviously backed up Synergy.

Q. How do you say you obviously backed up Synergy?
A. For example, if they couldn't make the case or maybe they didn't have privileges at a hospital, he still called us from time to time to do cases for him.

Q. That you have personal knowledge of. How do you know that he was calling you when Synergy couldn't do it? How do you know that?
A. Maybe remarks that the techs had made.

Q. Some unknown third person you can't identify today?
A. A tech. I mean, I don't know if I would call that an unknown third person, but - -

. . . .

Q. When the hospital pays for your services and then turns around and bills the patient, you're saying that the amount you're paid for your services is not disclosed to anyone by the hospital?
A. No.

Q. Are you sure?
A. Yes.

. . . .

Q. Why did . . . Dr. Alford stop using you in what appears to be early March of 2013?

. . . .

A. I don't know.

In sum, according to Boldery, a surgeon, like Alford, was not a customer of NeuroTex. Rather, NeuroTex is assigned cases by hospitals and paid by those hospitals. But even more germane to the issue at hand, Boldery does not know how NeuroTex is chosen to provide IOM services over a potential competitor, which may likewise have a contract with a particular hospital. In her testimony, Boldery makes clear that the basis of NeuroTex's injury is the fact that (1) Alford, a surgeon for whom NeuroTex had provided IOM services numerous times in the past now owned part of a competing company, Synergy, (2) Synergy hired Pierce, one of her former IOM technicians, and (3) NeuroTex is no longer assigned to Alford's cases. However, Pierce testified that he has not worked for Dr. Alford as an IOM technician while employed by Synergy.

15

Moreover, a document included in NeuroTex's Exhibit 10 to its response to Synergy's motion for summary judgment contains a list of Pierce's closed cases from November 12, 2013, through April 22, 2014.[10] This document lists two doctors per case. None of the cases indicate that Alford was a doctor on the case. In Exhibit 11 to its response, there are pay stubs from Synergy to Pierce, but this evidence does not indicate anything more than that Pierce was working for and being paid by Synergy after he was no longer employed by NeuroTex. Thus, we conclude that the fact that Pierce was employed by Synergy does not, in and of itself, prove that his breach of the covenant not to compete, if any, caused NeuroTex injury or damages.

NeuroTex further argues in its response that while Pierce worked there, NeuroTex received approximately $400,000 per year in income for performing IOM services on Alford's cases and since Pierce began working indirectly for Alford, NeuroTex has lost income. This argument is based directly on a statement from Boldery's affidavit. However, as before, because (1) Boldery also testified that she does not know how a hospital chooses NeuroTex over one of its competitors when multiple parties have contracts to perform IOM services and (2) the evidence indicates that Pierce has not performed IOM services for Alford while employed by Synergy, Boldery's assertion in her affidavit is no evidence that NeuroTex's reduction in profits is a result of Pierce's employment by Synergy.

NeuroTex next argues that even though it cannot show with certainty the profits it would have realized, it may introduce evidence of Synergy's profits, which can serve as evidence of the profits it would have made. *See **Sandare Chem. Co., Inc. v. WAKO Intern., Inc.***, 820 S.W.2d 21, 24 (Tex. App.–Fort Worth 1991, no writ). However, the issue is not the amount of damages NeuroTex suffered. Rather, the issue is whether these damages, if any, were caused by Pierce's breach, if any. Here, without evidence of when Synergy, as opposed to some other competitor, was assigned to a case instead of NeuroTex and that Pierce was the IOM technician on that case, any evidence of Synergy's profits has no correlation to NeuroTex's injury. Therefore, we hold that NeuroTex failed to bring forward more than a scintilla of evidence supporting that any breach by Pierce proximately caused injury to it.[11]

---

[10] This document also appears following several responses from Synergy to NeuroTex's discovery requests, which comprise Exhibit 6 to NeuroTex's response to Synergy's motion for summary judgment.

[11] In his no evidence motion for summary judgment, Pierce argued that NeuroTex had no evidence of any damages in support of its breach of covenant not to compete cause of action. NeuroTex's response to Pierce's motion mirrored closely its response to Synergy's motion for summary judgment on whether any breach caused any injury or damages as set forth above. For similar reasons, we likewise conclude that NeuroTex failed to bring forward more than

16

NeuroTex's sixth issue is overruled.


<u>**PROCEDURAL ISSUES**</u>

We now address NeuroTex's three procedural issues to the extent they relate to our overruling of part of its fourth issue and its sixth issue.

**Motion for Continuance**

In its first issue,[12] NeuroTex argues that the trial court erred when it denied its motion to continue the summary judgment hearings because there had not been an adequate time for discovery. Because Synergy's and Pierce's arguments pertaining to proximate cause of any injury or damages were "no evidence" issues, it was necessary that an adequate time for discovery had passed. *See* TEX. R. CIV. P. 166a(i). Specifically, in its response to Synergy's motion for summary judgment, NeuroTex argued as follows:

> **Motion for Continuance.** Plaintiff has filed a motion for continuance as there has not been an adequate time for discovery. Synergy has asserted various objections and has flatly refused to produce a significant amount of documents which are directly related to the income and profits received by Synergy as a result of Pierce's employment. These documents go directly to the issue of Plaintiff's damages as a result of both the breach of contract claim against Pierce and the tortious interference claim against Synergy. At the time of this filing, Plaintiff is awaiting the Court's ruling on its Motion to Compel Discovery from Synergy filed with the Court and set for submission on May 27, 2014.[13]

*Standard of Review*

A party may move for no evidence summary judgment only "[a]fter adequate time for discovery." **Id.**; **Specialty Retailers, Inc. v. Fuqua**, 29 S.W.3d 140, 145 (Tex. App.–Houston [14th Dist.] 2000, pet. denied). Rule 166a(i) does not require that discovery be completed before a party may move for no evidence summary judgment; the trial court may grant such a motion after "adequate time" for discovery. *See* **Madison v. Williamson**, 241 S.W.3d 145, 155 (Tex. App.– Houston [1st Dist.] 2007, pet. denied); **In re Mohawk Rubber Co.**, 982 S.W.2d 494, 498 (Tex. App.–Texarkana 1998, orig. proceeding). According to the comment to Rule 166a(i), "[a] discovery

---

a scintilla of evidence supporting that any breach by Pierce caused it any contractual damages. However, under the statute, NeuroTex may be entitled to injunctive relief. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c). Accordingly, Pierce's argument on the damages issue is not dispositive of NeuroTex's cause of action for breach of covenant not to compete.

[12] NeuroTex incorporates by reference its argument in its first issue into its argument in support of its sixth issue.

[13] NeuroTex made a nearly identical argument in response to Pierce's motion.

period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a motion under paragraph (i) would be permitted after the period but not before." TEX. R. CIV. P. 166a(i) cmt.; ***McInnis v. Mallia***, 261 S.W.3d 197, 200 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

When determining whether adequate time for discovery has elapsed, we consider (1) the nature of the cause of action; (2) the nature of the evidence necessary to controvert the no evidence motion; (3) the length of time the case has been active in the trial court; (4) the amount of time the no evidence motion has been on file; (5) whether the movant has requested stricter time deadlines for discovery; (6) the amount of discovery that has already taken place; and (7) whether the discovery deadlines that are in place are specific or vague. ***Madison***, 241 S.W.3d at 155; ***Fuqua***, 29 S.W.3d at 145 (citing ***Dickson Constr., Inc. v. Fid. & Deposit Co.***, 5 S.W.3d 353, 356 (Tex. App.–Texarkana 1999, pet. denied)). When a party moves for no evidence summary judgment before the end of the specified discovery period, "our principal task is to determine if [the] record provides support for the trial court's consideration of a no evidence summary judgment motion" before the end of the designated discovery time frame. ***McInnis***, 261 S.W.3d at 200. The "pertinent date for this inquiry is the final date on which the no evidence motion is presented to the trial court for ruling." ***Id.*** We review a trial court's determination that there has been an adequate time for discovery for an abuse of discretion. ***Fuqua***, 29 S.W.3d at 145. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner "without reference to any guiding rules or principles." ***Madison***, 241 S.W.3d at 155 (quoting ***Garcia v. Martinez***, 988 S.W.2d 219, 222 (Tex. 1999)).

*NeuroTex's Motions*

In its motion for continuance against Synergy, NeuroTex argued, in pertinent part, as follows:

> As shown above, discovery is ongoing in this matter. Plaintiff has filed suit against Defendant Synergy for tortiously interfering with an employment agreement. Plaintiff has requested the Court compel documents which will enable it to support its claim for damages, specifically lost profits. Furthermore, the deposition of Dr. Alford is likely to produce evidence related to Defendant Synergy's intentional interference with the subject agreement.

Similarly, in its motion for continuance against Pierce, NeuroTex argued, in pertinent part, as follows:

> As shown above, discovery is ongoing in this matter. Plaintiff has filed suit against Defendant Pierce for breach of a covenant not to compete and breach of fiduciary duty. Plaintiff has requested the Court compel documents which will enable it to support its claim for damages,

18

specifically lost profits. Furthermore, the deposition of Dr. Alford is likely to produce evidence related to Defendant Synergy's intentional interference with the subject agreement.

*Consideration of Factors*

The nature of causes of action for breach of covenant not to compete and tortious interference with a covenant not to compete are, as a general matter, relatively straightforward. However, under the facts of this case, when seeking to determine whether any breach caused injury or damages, the application of the restrictions in the covenant to the job duties later performed by the employee for his new employer is a complex and tedious undertaking.

The instant case was filed on December 23, 2013. A scheduling order was signed on January 14, 2014. It listed the last day to file a motion for summary judgment as May 12, 2014, and June 20, 2014, as the day on which discovery shall be completed. Synergy was added as a party on February 21, 2014. Synergy filed its combined traditional and no evidence motion for summary judgment on May 9, 2014. It later sought to supplement the summary judgment evidence two times, the last time on May 29, 2014. Synergy requested a submission date of June 12, 2014. Pierce filed his no evidence motion for summary judgment on May 12, 2014, and requested a submission date of June 13, 2014. NeuroTex filed its motion for continuance on June 2, 2014. The trial court rendered its order granting Synergy's and Pierce's respective motions for summary judgment on June 17, 2014.

NeuroTex sought to conduct a large amount of discovery in this short period of time. In late April, it served Synergy with interrogatories, requests for production of documents, and requests for admissions. Synergy responded with numerous objections to the discovery requests, but provided some information subject to those objections. NeuroTex filed a motion to compel on May 6, 2014. It set its motion for submission on May 27, 2014. Furthermore, Boldery's and Pierce's depositions had been taken, and there had been an evidentiary hearing on NeuroTex's application for temporary injunction, which included live testimony. Also, NeuroTex had sent notices of deposition to Alford and its expert, Dr. George Cravens, which were scheduled to be taken on June 10 and 13, 2014, respectively.

In its motion, NeuroTex references Alford's deposition as the source of material evidence, but does not offer any guidance as to how his testimony might relate to the issue of injury or damages. Nor does it, in its brief on appeal, indicate (1) whether his deposition was taken prior to the trial court's ruling on Synergy's motion for summary judgment and (2) whether any of the testimony he gave was germane to the issue of its lost profits.

NeuroTex also noted in its motion for continuance that it filed a motion to compel, by which it hoped to discover information relating to lost profits. NeuroTex has not challenged the trial court's ruling on its motion to compel in this appeal,[14] nor does the motion for continuance go into great detail about what documents will support its claim for lost profits. Nonetheless, we have reviewed the motion to compel and the discovery requests to which it relates. Having done so, we note that only Interrogatory Number 4 requests information germane to the issue of whether NeuroTex had evidence supporting that any breach by Pierce proximately caused it injury.[15] Interrogatory Number 4 states as follows:

> Identify all physicians who Defendant Pierce has worked with while employed by [NeuroTex]. For each, include the following:
>
> (a) the name and address of each such physician;
> (b) the dates worked with each such physician; and
> (c) who worked with each physician.

Synergy objected, and the propriety of that objection is not before us on appeal. However, in conjunction with its objection, Synergy answered the interrogatory as follows:

> Without waiving and subject to Synergy's General Assertions, Synergy has compared the physicians for whom Pierce performed IOM while employed by Plaintiff with those physicians for whom Pierce has performed IOM while employed by Synergy. While employed by Synergy, Pierce has not performed IOM services for any physician that he performed IOM for while employed by Plaintiff. Additionally, see list attached as Exhibit A to this response.[16]

As a result, NeuroTex received discovery responsive to this request consisting of a list of surgeries on which Pierce had worked as an IOM technician on Synergy's behalf from November 2013 through April 2014. This discovery was attached to NeuroTex's responses to Synergy's and Pierce's respective motions for summary judgment. From that list, it could determine the date of the surgery, the hospital in which the surgery was performed, and who the surgeons were. But in its

---

[14] *See* TEX. R. APP. P. 38.1(i).

[15] Interrogatory Number 3 asks for information concerning all hospitals for which NeuroTex performs IOM services. Similarly, Interrogatory Number 5 asks for the name and address of each facility Pierce worked at while employed by Synergy and the dates related to that work. But as a result of Boldery's testimony that she does not know how a hospital would choose NeuroTex over a competitor, this information (including that which was provided by Synergy) without more, is not helpful in demonstrating proximate cause.

[16] Exhibit "A" comprises the aforementioned list of physicians and hospitals for whom Pierce performed IOM services from November 2013 through April 2014.

responses to the motions for summary judgment, it declined to elaborate on how that list demonstrates that any breach by Pierce proximately caused it any injury.

We have carefully reviewed NeuroTex's motions for continuance and the motion to compel in consideration of the aforementioned factors. Having done so, we note that although the discovery period was short in light of the complexity of the case, NeuroTex conducted a considerable amount of discovery during that time. However, we further note that NeuroTex received responses to its discovery chronicling Pierce's work as an IOM technician for Synergy from the beginning of his employment with it through on or about the date of the discovery request. None of the other requested information was germane to the issue of causation, injury, or damages.

Furthermore, NeuroTex has not argued on appeal that it was prevented from taking the two June depositions or, assuming it was not, that it was prevented from using any of this testimony as material evidence in its response to Synergy's and Pierce's respective motions for summary judgment. Nor has NeuroTex challenged the trial court's ruling on its motion to compel in this appeal.

In consideration of the foregoing, we conclude that the trial court did not abuse its discretion in overruling NeuroTex's motions for continuance. NeuroTex's first issue is overruled.

## Special Exceptions to Summary Judgment Motions

In part of its second issue, NeuroTex argues that Synergy's motion failed to provide it with fair notice of the type of summary judgment sought. It further argues, in part, that Pierce's evidence summary judgment allegations are insufficient to shift the burden of proof to it under Rule 166a(i).

### *Governing Law*

Summary judgments must stand on their own merits. ***Cuyler v. Minns***, 60 S.W.3d 209, 212 (Tex. App.–Houston [14th Dist.] 2001, pet. denied). As set forth previously, a no evidence motion for summary judgment must state the elements as to which the movant contends there is no evidence. *See **Holloway v. Tex. Elec. Util. Const., Ltd.***, 282 S.W.3d 207, 213 (Tex. App.–Tyler 2009, no pet.); ***Callaghan Ranch, Ltd. v. Killam***, 53 S.W.3d 1, 3 (Tex. App.–San Antonio 2001, pet. denied). The motion must be specific in challenging the evidentiary support for an element of a claim or defense; conclusory motions or general no evidence challenges to an opponent's case are not authorized. ***Id.*** If a no evidence motion for summary judgment is not specific in challenging a particular element or is conclusory, the motion is legally insufficient as a matter of law and may be challenged for the first time on appeal. ***Id.***; *see also **Crocker v. Paulyne's Nursing Home, Inc.***, 95 S.W.3d 416, 419 (Tex. App.–Dallas 2002, no pet.); ***Minns***, 60 S.W.3d at 213.

21

NeuroTex acknowledges that Synergy's motion for summary judgment cites to both Rules 166a(c) and 166a(i). However, it argues that the arguments are intertwined and it is unclear which claims fall under the traditional motion. Although Texas Rule of Civil Procedure 166a does not prohibit the presentation of a combination traditional and no evidence motion, the better practice is to file two separate motions. *See Holloway*, 282 S.W.3d at 213 n.3.

In the instant case, we first note that Synergy did not specify in its special exceptions to the trial court any particular points of confusion. Rather, its assertions were global. Nonetheless, insofar as it relates to this appeal, we will focus solely on Synergy's motion's sufficiency to give NeuroTex fair notice of the type of summary judgment sought concerning the proximate cause issue.

In its motion, Synergy argued, in pertinent part, as follows:

> As part of its tortious interference claim, Plaintiff must also establish that it suffered damages. *See Powell Indus.*, 985 S.W.2d at 456 (listing of elements for tortious interference).
>
> Plaintiff testified that it is assigned cases by hospitals, but does not know how it is chosen for a case over a competitor. There is no evidence that any hospital or surgical center has assigned one less case to Plaintiff as a result of Pierce's leaving Plaintiff's employ, as a result of Pierce['s] becoming an employee of Synergy, or as the result of Pierce['s] providing monitoring for Synergy. In fact, there is no evidence that Plaintiff was assigned one less case for any reason whatsoever.

In crafting its argument, Synergy set forth the element on which NeuroTex bore the burden of proof and provided a case citation to the elements. It prefaced the matter by stating that Boldery had testified as to her lack of understanding about how one technician is chosen over the other. Next, it stated, albeit in a more fact specific manner, that there was no evidence concerning that element, namely that NeuroTex had suffered any injury resulting from Pierce's leaving its employ. What is more, Synergy twice underlined the words "no evidence."

Based on the clear language of Synergy's motion, we conclude that it properly moved for no evidence summary judgment on the issue of whether any breach by Pierce proximately caused injury to NeuroTex. *See* TEX. R. CIV. P. 166a(i). Therefore, we hold that the trial court did not abuse its discretion in overruling NeuroTex's special exceptions to Synergy's motion for summary judgment as it relates to proximate cause of injury or damages.

*Pierce's Motion*

As set forth in greater detail in our analysis of NeuroTex's fifth issue, Pierce's motion has its shortcomings. However, it is styled as a no evidence motion for summary judgment. It cites to

Rule 166a(i).  It sets forth that NeuroTex sued Pierce for breach of a covenant not to compete and seeks damages thereon.  And, most importantly, it alleges in Paragraph 18 that NeuroTex has "no evidence of any damages."  Therefore, we hold that the trial court did not abuse its discretion in overruling NeuroTex's special exceptions to Pierce's no evidence motion for summary judgment as it relates to damages.

NeuroTex's second issue is overruled in part.

## Motion to Strike Summary Judgment Evidence

In its third issue, NeuroTex argues that the trial court erred in denying its motion to strike Synergy's second supplement to its summary judgment evidence as well as Exhibits 5 and 6 to its motion for summary judgment.  In our consideration of whether there was any evidence to support whether any breach by Pierce proximately caused NeuroTex injury, we relied on Exhibits 6, 7, and 9 to NeuroTex's response to Synergy's motion for summary judgment.  While some of this evidence is duplicative of Synergy's summary judgment evidence, none of it originates solely from Synergy's supplemental summary judgment evidence or from its Exhibits 5 and 6.  Therefore, we need not address NeuroTex's third issue.  *See* TEX. R. APP. P. 47.1.

## BREACH OF FIDUCIARY DUTY

In its fifth issue and part of its second issue, NeuroTex argues that the trial court erred by granting summary judgment in Pierce's favor on its breach of fiduciary duty claim because his motion was insufficient as a matter of law.

## No Evidence Motion

As set forth previously, summary judgments must stand on their own merits. *Cuyler*, 60 S.W.3d at 212.  A no evidence motion for summary judgment must state the elements as to which the movant contends there is no evidence. *See Callaghan Ranch, Ltd.*, 53 S.W.3d at 3.  The motion must be specific in challenging the evidentiary support for an element of a claim or defense; conclusory motions or general no evidence challenges to an opponent's case are not authorized. *Id.* If a no evidence motion for summary judgment is not specific in challenging a particular element or is conclusory, the motion is legally insufficient as a matter of law and may be challenged for the first time on appeal. *Id.*; *see also Crocker*, 95 S.W.3d at 419; *Minns*, 60 S.W.3d at 213.

In the instant case, Pierce's no evidence motion set forth, in pertinent part, as follows:

23

## III.  SUMMARY JUDGMENT FACTS

. . . .

8.      Plaintiff presents no evidence of breach of fiduciary duty while employed.

. . . .

## IV.  ARGUMENTS AND AUTHORITIES

. . . .

21.      Plaintiff also brings a cause of action for breach of fiduciary duty, yet again does not bring forth any evidence of such a breach during the time of his employment (Exhibit 1). Defendant seeks summary judgment that Defendant did not breach his fiduciary duty while employed at Plaintiff.

The requirements a movant must satisfy under Rule 166a(i) are straightforward. *See Holloway*, 282 S.W.3d at 215. To shift the burden of proof to its opponent, when there has been adequate time for discovery, the movant need only (1) state the elements as to which there is no evidence and (2) state that there is no evidence as to one or more of those elements. *Id.* We decline to extend a "fair notice" exception to the requirements of Rule 166a(i). *Id.*; *see Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 824 n.4 (Tex. App.–Fort Worth 2008, no pet.); *Mott v. Red's Safe and Lock Servs., Inc.*, 249 S.W.3d 90, 98 (Tex. App.–Houston [1st Dist.] 2007, no pet.).

As such, we cannot conclude with any level of confidence that Pierce satisfied Rule 166a(i)'s low threshold in his motion. Rather, Pierce makes only a general argument that NeuroTex has no evidence to support its breach of fiduciary duty cause of action. Thus, we hold that Pierce's no evidence motion is legally insufficient with regard to breach of fiduciary duty and the trial court's order granting Pierce's no evidence motion for summary judgment on that cause of action was erroneous. NeuroTex's fifth issue is sustained. Its second issue is sustained in part.

## CONCLUSION

We have overruled NeuroTex's first and sixth issues and have overruled its second and fourth issues in part. Furthermore, we have sustained NeuroTex's fifth issue as well as part of its second and fourth issues. Having done so, we *reverse* the trial court's summary judgment granted in Pierce's favor with regard to NeuroTex's causes of action for breach of covenant not to compete

and breach of fiduciary duty and ***remand*** this cause for further proceedings consistent with this opinion.  We ***affirm*** the trial court's summary judgment rendered in Synergy's favor.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered July 12, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JULY 12, 2016

NO. 12-14-00254-CV

**NEURODIAGNOSTIC TEX, L.L.C.,**
Appellant
V.
**ROBERT "JOSH" PIERCE AND SYNERGY IOM, LLC,**
Appellee

Appeal from the 7th District Court

of Smith County, Texas (Tr.Ct.No. 13-3357-A)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the trial court's summary judgment granted in Appellee Robert "Josh" Pierce's favor with regard to Appellant Neurodiagnostic Tex, L.L.C.'s causes of action for breach of covenant not to compete and breach of fiduciary duty be **reversed** and the cause **remanded** to the trial court **for further proceedings** consistent with this opinion; It is further ORDERED, ADJUDGED and DECREED that the trial court's summary judgment rendered in Appellee Synergy IOM, LLC's favor is hereby **affirmed**; and that all costs of this appeal be assessed one-half against the Appellant, **NEURODIAGNOSTIC TEX, L.L.C.,** and one-half against the Appellee, **ROBERT "JOSH" PIERCE**; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*