**Reversed and Remanded and Opinion filed July 20, 2017.**



In The

# Fourteenth Court of Appeals

## NO. 14-16-00879-CV

## COOPER VALVES, LLC AND BARRY DON HOEFFNER, Appellants

## V.

## VALVTECHNOLOGIES, INC., Appellee

**On Appeal from the 11th District Court
Harris County, Texas
Trial Court Cause No. 2016-67168**

## O P I N I O N

Appellee ValvTechnologies, Inc. (VTI) filed this suit after appellant Barry Hoeffner left its employ and went to work for appellant Cooper Valves, LLC. In this accelerated interlocutory appeal, Cooper Valves and Hoeffner challenge the trial court's order granting a temporary injunction requested by VTI.[1]

Appellants argue that the trial court abused its discretion when it signed the

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West 2015).

temporary injunction because the order (1) is based on unenforceable noncompetition and nonsolicitation covenants by Hoeffner, (2) is overbroad and vague in violation of Texas Rule of Civil Procedure 683, and (3) contains findings by the trial court that are not supported by sufficient evidence. We conclude Hoeffner's covenants are unenforceable and cannot support the sections of the temporary injunction based on them. We further conclude that although there is evidence in the record supporting the trial court's findings of misappropriation and threatened misappropriation of certain VTI trade secrets, the temporary injunction violates Rule 683 because it is impermissibly vague and overbroad. We therefore reverse the challenged sections of the trial court's temporary injunction and remand the case to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

VTI is in the business of designing, developing, manufacturing, and selling various types of industrial valves worldwide. Cooper operates a similar business. The two companies compete, however, in only a single category of valves: metal-seated ball valves for severe service applications.

Hoeffner worked for Baker Hughes Corporation, where he developed an expertise in addressing customers' industrial process and design problems. Kevin Hunt, the CEO of VTI, hired Hoeffner in 1997. Hoeffner signed an agreement with VTI at that time, and it provides that he is an at-will employee. In the 1997 Agreement, Hoeffner agreed not to disclose VTI's "Confidential Business Information," which is defined as including

> any information not generally known in the relevant trade industry, which is disclosed to, discovered by, or known to [Hoeffner] as a consequence of [Hoeffner's] employment by [VTI], including but not limited [to] information concerning [VTI's] products, processes,

2

services, research developments, manufacturing, purchasing, accounting, engineering, marketing, distribution, construction, merchandising, selling, soliciting, or customers, regardless of whether the information is in a written or unwritten form; and including but not limited to drawings, blueprints, plans, computer programs and printouts, manuals, notebooks, compositions, reports, files, records, customer lists, accounting sheets and statements, proposals, formulae, processes, and machines. The parties agree that the use of the term Confidential Business Information in this Agreement shall include all of the foregoing.

The 1997 Agreement also includes a covenant not to compete. This covenant provides, in pertinent part,

2.      Noncompetition by Employee:

For a period of two (2) years after the termination of [Hoeffner's] employment for any reason, [Hoeffner] agrees that he will not, either directly or indirectly, become an employee, manager, owner, officer of, or consultant for any other company, corporation or entity within the world, where such other company, corporation, or entity is engaged, either directly or indirectly, in a Business which is competitive with the Business of [VTI]. [Hoeffner] agrees that this restriction applies to [Hoeffner's] performance of the same or similar duties and activities [Hoeffner] performed for [VTI] or activities where the performance of such activities could result in the disclosure of the Confidential Business Information of [VTI]. . . .

The 1997 Agreement additionally provides that Hoeffner cannot solicit VTI's customers for the purpose of competing with VTI, and cannot "solicit the employees of [VTI] for purposes of hiring such individuals to enter into competition with [VTI]." According to the agreement, it cannot "be modified, amended, or terminated except by a written instrument executed by [Hoeffner] and a duly authorized officer of [VTI]."

Hoeffner worked for VTI from 1997 until early 2000, when he quit and went to work for a software company. According to Hunt, when Hoeffner left VTI,

3

there was no expectation that he would return to work for VTI, there were no discussions at that time regarding Hoeffner returning to VTI, and VTI did not hold his job open for Hoeffner while he was gone. Additionally, Hunt testified that if Hoeffner had gone to work for a competitor, VTI would have considered that a breach of his covenant not to compete.

Approximately eighteen months after leaving VTI, Hoeffner approached Hunt about returning to work there. Hunt, concerned because Hoeffner's departure had been under less than ideal circumstances, told Hoeffner that he would have to think about it. Ultimately, Hoeffner went through an interview process with senior-level VTI employees to determine whether "everybody could get along." Hoeffner was rehired on October 1, 2001.

VTI required Hoeffner to sign a new confidentiality agreement when he was rehired, but not a new noncompetition agreement. The 2001 Confidentiality Agreement included a new definition of confidential information:

> As used in this Agreement, the term "Confidential Information" means (1) proprietary information of VTI; (2) information marked or designated by VTI as confidential; (3) information, whether or not in written form and whether or not designated as confidential, which is know [sic] to me as being treated by VTI as confidential; and (4) information provided to VTI by third parties which VTI is obligated to keep confidential. Confidential information includes, but is not limited to, computer programs, discoveries, ideas, designs, drawings, specifications, techniques, computer and other models, data, statistical and other programs, documentation, processes, know-how, customer lists, marketing plans, and financial and technical information.

Hoeffner agreed that he would not disclose any VTI confidential information without VTI's written consent. Hoeffner further agreed that he would not "copy, transmit, reproduce, summarize, quote, or make any commercial or other use whatsoever of confidential information, except as may be necessary to perform my

4

duties for VTI." Finally, Hoeffner agreed that he would "exercise the highest degree of care in safeguarding confidential information against loss, theft, or other inadvertent disclosure, and agree generally to take all steps necessary to ensure the maintenance of confidentiality."

After his return to VTI, Hoeffner became the Industry Director of Hydrocarbons.[2] In that role, Hoeffner was responsible for VTI's worldwide hydrocarbon operations and was aware of confidential information, planning, and worldwide activities regarding that industry, including the development of new valves for VTI clients.[3] In addition, as an Industry Director, Hoeffner participated in company-wide planning and status meetings. Personnel from all six VTI industry groups participated in these meetings, and Hoeffner therefore knew about and had access to all types of VTI confidential information.

Hoeffner began talking with representatives from Cooper about becoming Cooper's president in August or September 2015. Hoeffner revealed VTI's profit margin for metal-seated ball valves to Ionel Nechiti, a Cooper owner, during those negotiations. Hoeffner also told Nechiti that "I know I am still riding a fence here, but I would like to introduce Steve [Mines] to some contacts in Total." Total was a VTI customer, Mines was a Cooper employee, and the referenced contacts were people Hoeffner had met at Total through his work at VTI. Hoeffner also asked Nechiti about Cooper's interest in "a Trunnion product either through design or acquisition." At that time, a trunnion valve was a type of valve that VTI produced

---

[2] VTI is organized into groups that serve six "Industries:" (1) Hydrocarbons, (2) Oil & Gas, (3) Midstream, (4) Nuclear, (5) Power, and (6) Specialty Industries.

[3] It is undisputed that Hoeffner was given access to VTI confidential information and trade secrets during both segments of his VTI career so that he could perform his job responsibilities.

but Cooper did not.[4]   Additionally, Hoeffner had been deeply involved in VTI's development of the trunnion valve.  The negotiations were successful and Hoeffner accepted the position of president at Cooper on January 4, 2016.

Hoeffner notified VTI that he was leaving the company on January 18.  On January 25, when Hoeffner arrived at VTI, he was summoned to a meeting.  Edward Ferris, VTI's Director of Human Resources, asked Hoeffner to turn in his VTI laptop computer, which he did.  Ferris also asked Hoeffner to turn over his personal cell phone to Keith Bethel, VTI's Information Technology manager.[5]  Hoeffner did so and then allowed Bethel to delete anything he wanted from the phone, including all VTI-related information.  Bethel also wiped Hoeffner's contacts—both business and personal—from the phone.  According to Hoeffner, within two days of his departure from VTI, he deleted all VTI documents he could find from his personal computers and then turned those machines over to a third-party forensic IT company for quarantining.  Hoeffner had no access to his computers after that date.

Soon after he started working for Cooper, Hoeffner met with representatives from Bechtel, a VTI "specifier."  Hoeffner explained that a specifier is a company that writes specifications for projects and therefore influences which valves and other products a customer will buy for a particular project.  Hoeffner also met with representatives from Dow, Monroe Refining, ExxonMobil, Total, and Marathon—all VTI customers.  While employed at VTI, Hoeffner had worked on a project to design Porvair's Pulsejet Valve.  Once he moved to Cooper, Hoeffner contacted representatives at Porvair regarding Cooper's interest in developing two possible

---

[4] According to Hunt, a trunnion valve differs from an ordinary metal-seated valve because it has two stems—one on top and the other on the bottom—that hold the valve in place.

[5] Hoeffner did not use a VTI-owned cell phone.

valves, "a ball valve and the other a rising stem possibility."[6]

On October 3, 2016, VTI filed suit against Hoeffner and Cooper alleging, among other things, that Hoeffner and Cooper misappropriated VTI confidential information and trade secrets and that Hoeffner breached his 1997 and 2001 Agreements, including the 1997 covenant not to compete. VTI sought a temporary restraining order as well as temporary and permanent injunctions. After a three-day evidentiary hearing, the trial court granted VTI's request for a temporary injunction.

The court's order imposing the temporary injunction includes a lengthy definition of VTI's "Confidential and Trade Secret Information." According to the order, such information "includes, but is not limited to the following" categories: (1) "information regarding the actual customers of [VTI] listed on the attached [Exhibits 1 and 1A] which [have] been filed under seal, as well as [VTI's] specifiers and distributors. . . .;"[7] (2) engineering, manufacturing, and product development information for VTI valves; (3) vendors for materials, labor, and services for the valves; (4) information on VTI's research and development; (5) VTI's financial results; (6) its product pricing methodologies and profit margins;

---

[6] In its appellate brief as well as during oral argument, VTI referenced Plaintiff's Exhibit 37 in its discussions of Hoeffner's interactions with Porvair after he had joined Cooper. VTI also attached a purported Plaintiff's Exhibit 37 to its appellate brief. This exhibit was not admitted into evidence during the temporary injunction hearing, however. It also does not otherwise appear in the appellate record. We may consider the cited testimony, but we cannot consider the unadmitted exhibit. Tex. R. App. P. 34.1 (describing contents of appellate record); *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n. 23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("[W]e cannot consider documents attached as appendices to briefs and must consider a case based solely upon the record filed.").

[7] Two sealed exhibits are attached to the temporary injunction order, Exhibit 1 and Exhibit 1-A. Exhibit 1 runs forty-pages in length and contains a list of approximately 1800 entities, some of which are duplicates of each other. Exhibit 1-A contains a list of 33 entities. The lists contain VTI's customers, specifiers, and distributors and they are collectively defined by the order as the customers of VTI.

7

and (7) its business plans.

The trial court made six findings of fact:

(1)     [VTI] will likely prevail on its claim it holds confidential, proprietary, and trade secret information relating to its business, including the Confidential and Trade Secret Information.

(2)     [VTI] has established that, at a minimum, the Confidential and Trade Secret Information is entitled to trade secret protection until a trial on the merits.

(3)     [VTI] will likely prevail on its claim that Hoeffner has contractual obligations not to compete with [VTI], not to solicit the customers of [VTI] and not to solicit the employees of [VTI].

(4)     Hoeffner has statutory and contractual non-disclosure obligations owed to [VTI], and Hoeffner has no lawful right to possess, access, use, or disclose this Confidential and Trade Secret Information.

(5)     Cooper has statutory non-disclosure obligations owed to [VTI], and Cooper has no lawful right to possess, access, use, or disclose this Confidential and Trade Secret Information through its employees, such as Hoeffner, or otherwise.

(6)     Unless temporarily enjoined, [appellants] will possess, access, use, or disclose this Confidential and Trade Secret Information, and [VTI] will suffer immediate and irreparable injury, loss, or damage as a result.

The court then went on to conclude that

(1) Hoeffner is working for Cooper and Cooper's lines of business which design, manufacture, and sell severe service metal-seated ball valves, in competition with [VTI], which includes Cooper's Accuseal line of business and Cooper's GE/Dresser line of business, in violation of Hoeffner's contractual non-competition and non-solicitation obligations; (2) Hoeffner is, including on behalf of Cooper, using [VTI's] Confidential and Trade Secret Information to compete with [VTI] and to solicit customers, in violation of Hoeffner's contractual non-competition and non-solictiation obligations; (3) Hoeffner has possession, custody, or control over

8

[VTI] documents and information which contain or are Confidential and Trade Secret Information; (4) Hoeffner, individually and on behalf of Cooper, has used and is currently utilizing [VTI's] Confidential and Trade Secret Information in violation of Hoeffner's and Cooper's statutory and/or contractual non-disclosure covenants; and (5) Hoeffner has and is assisting Cooper in hiring or attempting to hire [VTI's] employees, in violation of his restrictive covenants.

Based on these findings and conclusions, the trial court imposed numerous restraints on appellants, including:[8]

. . . .

(b)    [Appellants] and their employees are restrained from directly or indirectly possessing, copying, selling, disclosing, or using any of [VTI's] Confidential and Trade Secret Information.

. . . .

(f)    [Appellants] and their employees shall not engage or participate in any way in the design, development, or manufacture of a pulsejet type valve for any person, including but not limited to Porvair.

(g)    [Appellants] and their employees shall not engage in any way in the design, development, or manufacture of a severe service metal-seated trunnion ball valve.

. . . .

(i)    Hoeffner shall not directly or indirectly hire, attempt to hire, solicit for purposes of hiring, or participate in the hiring or decision to hire any then-current employee of [VTI].

(j)    Hoeffner shall not direct, guide, lead, contribute to, participate in, be involved with, consult regarding, review information about, make suggestions or comments about, sell, market, make

---

[8] The trial court's temporary injunction includes several other provisions and restraints that appellants have not challenged on appeal. The court originally restricted access to the customer lists in Exhibits 1 and 1-A to the parties' attorneys. Appellants complained about this restriction in their opening briefs. The trial court subsequently removed this restriction, rendering appellants' complaints moot. The temporary injunction originally expired by its terms on April 17, 2017, but the trial court later extended it.

9

presentations about, be involved in identifying, communicating with, or contracting with vendors, suppliers, and manufacturers with regard to Cooper's lines of business pertaining to severe service metal-seated ball valves or any components or parts for use in severe service metal-seated ball valves, including Cooper's Accuseal line of business and Cooper's GE/Dresser line of business.

## ANALYSIS

Appellants filed separate briefs, and they challenge specific sections of the trial court's temporary injunction order in multiple overlapping issues.[9] We address appellants' issues together to the extent necessary to resolve the appeal. *See* Tex. R. App. P. 47.1.

## I.    Standard of review and applicable law

The purpose of a temporary injunction is to preserve the status quo regarding the subject matter of the litigation pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g). To obtain a temporary injunction, an applicant is not required to establish that it will prevail in a final trial on the merits, but must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim. *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 419 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). Litigants are not entitled to temporary injunctive relief as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam). The decision to grant or deny such relief instead is committed to the trial court's

---

[9] During the temporary injunction proceedings in the trial court, Hoeffner and Cooper were represented by the same counsel. On appeal, separate counsel appeared for each appellant. During oral argument, Hoeffner's attorney revealed that Cooper terminated Hoeffner at an unknown time after the trial court signed the temporary injunction. Cooper's counsel confirmed Hoeffner's termination.

10

discretion, and we will uphold its ruling absent a clear abuse of discretion. *Id.* at 58.

We do not substitute our judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Sharma*, 231 S.W.3d at 419. We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor. *Id.* An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence. *Id.* Our review is less deferential however when reviewing legal issues. *Cook v. Tom Brown Ministries*, 385 S.W.3d 592, 600 (Tex. App.—El Paso 2012, pet. denied). A trial court has no discretion in determining what the law is or in applying the law to the facts. *Id.* (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)). Therefore, a court abuses its discretion if there is a clear failure to analyze or apply the law correctly. *Id.* A trial court also abuses its discretion when the evidence does not reasonably support the findings of probable injury or probable right of recovery. *Rugen v. Interactive Business Systems. Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ.).

Although the decision to grant or deny a request for a temporary injunction is committed to the sound discretion of the trial court, once the court decides to grant injunctive relief, the order itself must contain the reasons for its issuance, be specific in its terms, and describe in reasonable detail the acts restrained by the order without reference to the complaint or any other document. *Helix Energy Sol. Grp., Inc. v. Howard*, 452 S.W.3d 40, 44 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing Tex. R. Civ. P. 683). These requirements are mandatory. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986). An order that does not comply with Rule 683's requirements "is subject to being declared void and dissolved." *Helix Energy Sol. Grp., Inc.*, 452 S.W.3d at

11

44 (quoting *InterFirst Bank San Felipe, N.A.*, 715 S.W.2d at 641).

## II. The trial court abused its discretion by issuing an injunction based in part on the 1997 noncompetition and nonsolicitation covenants.

Both appellants argue in their first issues that the trial court abused its discretion in issuing the temporary injunction because VTI failed to establish a probable right to relief given that Hoeffner's 1997 covenant not to compete expired two years after his initial departure from VTI. Hoeffner also argues in his first issue that VTI failed to establish a probable right to relief because the nonsolicitation provisions of the 1997 Agreement are unenforceable. We address these contentions together because both noncompetition covenants and nonsolicitation covenants like those in the 1997 Agreement are governed by the Covenants Not to Compete Act. *See Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) ("Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [Covenants Not to Compete] Act.").

In the 1997 Agreement, Hoeffner agreed that he would not work for a business competing with VTI anywhere in the world for a period of two years after his employment with VTI terminated for any reason. That two-year period commenced when he quit working for VTI sometime in 2000 and expired two years later. *See Lasser v. Amistco Separation Prods., Inc.*, No. 01-14-00432-CV, 2014 WL 4952501, at *10 (Tex. App.—Houston [1st Dist.] Oct. 2, 2014, no pet.) (mem. op.) (holding noncompetition period ended two years after Lasser's employer, ASC, terminated his employment, not two years after Lasser terminated employment with company that purchased ASC's assets). Because Hoeffner's noncompetition covenant expired in 2002, fourteen years before the present

litigation started, it is unenforceable and the trial court abused its discretion when it included sections (f), (g), and (j) in the temporary injunction. *Id.* (citing *ICON Benefit Adm'rs II, L.P. v. Abbott*, 409 S.W.3d 897, 902 (Tex. App.—Austin 2013, pet. denied)). In addition, because Cooper never had a noncompetition agreement with VTI, the trial court abused its discretion when it included Cooper in the restrictions found in sections (f) and (g).

VTI makes two arguments against this result. First, VTI argues Hoeffner's eighteen-month period of employment elsewhere was a leave of absence, and therefore the two-year noncompetition period did not start running at the time of his 2000 departure. The evidence does not support this argument. A leave of absence "is not a complete separation from employment" and "connotes a continuity of the employment status." *Chenault v. Otis Eng'g Corp.*, 423 S.W.2d 377, 383 (Tex. Civ. App.—Corpus Christi 1967, writ ref'd n.r.e.). But VTI's president testified that at the time Hoeffner left VTI in 2000, there was no expectation Hoeffner would return to work at VTI, there were no discussions regarding a future return to VTI, and VTI did not hold Hoeffner's job open for him. Hoeffner confirmed this version of events. Also, no VTI documents describing Hoeffner's departure as a leave of absence were admitted into evidence during the hearing.[10]

Second, VTI asserts that when Hoeffner returned to work in 2001, which was within the two-year noncompetition period, Hoeffner and VTI's CEO orally agreed to reinstate the 1997 Agreement. Even if such an oral agreement were made (which Hoeffner denies), it would have no effect because the 1997

---

[10] VTI also argues that the two-year noncompetition term did not begin to run when Hoeffner left VTI in 2000 because he did not terminate the agreement in writing. Because VTI cites no legal authority in support of this argument, we do not address it. *See* Tex. R. App. P. 38.1.

Agreement contains an integration clause prohibiting oral modifications. *See Lawrence v. Reyna Realty Group*, 434 S.W.3d 667, 674 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding contractual provision requiring written modifications "negates the apparent authority of an agent to vary orally the written terms of the agreement"). Moreover, the 1997 Agreement falls within the statute of frauds because it contains a two-year noncompetition term. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(6) (West 2015) (requiring agreements that cannot be performed within one year to be in writing). As a result, an oral modification of that agreement is not enforceable. *Lawrence*, 434 S.W.3d at 673 (stating general rule that if contract falls within statute of frauds, party cannot enforce subsequent oral modification).

VTI seeks to avoid the statute of frauds by pointing out that the parties to a written contract may orally agree to extend the time of performance if they make the agreement before the written contract expires. *See Lawrence*, 434 S.W.3d at 673 (recognizing exception to statute of frauds). But the oral modification asserted by VTI did not extend the time for performance of the promises under the 1997 Agreement; for example, it did not extend VTI's promises to employ Hoeffner and pay him annual incentive payments through the period in 2000 and 2001 when Hoeffner was employed elsewhere. Rather, VTI contends that the parties orally reinstated the agreement's promises upon Hoeffner's reemployment in 2001. Accordingly, the limited exception to the statute of frauds for extensions of performance does not apply. *See Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984) ("It goes without saying that a contract required to be in writing cannot be orally modified except in limited circumstances such as extension of time for performance.").

In addition, any 2001 oral agreement to reinstate the 1997 Agreement would

14

itself be subject to the statute of frauds because it could not be performed within one year. According to VTI, the effect of the reinstatement agreement was to reset the two-year noncompetition period. Because the reinstatement is not in writing, it is unenforceable. *Cruikshank v. Consumer Direct Mortg., Inc.*, 138 S.W.3d 497, 501 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("If [evidence regarding the terms of an oral contract] establishes the contract cannot be performed within one year, the oral contract violates the statute of frauds as a matter of law.").[11]

We turn next to the two nonsolicitation provisions in Hoeffner's 1997 Agreement. Those provisions seek to restrict Hoeffner's ability to compete with VTI by prohibiting him from soliciting VTI's customers and employees. To be enforceable, noncompetition provisions such as Hoeffner's must contain limitations as to time, geographic area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interest of the employer. *See* Tex. Bus. & Com. Code Ann. § 15.51(c) (West 2015); *Marsh,* 354 S.W.3d at 777 ("The hallmark of enforcement is whether or not the covenant is reasonable."). Neither nonsolicitation provision in Hoeffner's 1997 Agreement contains geographic or time limitations. Neither specifies the types of customers or employees that are

---

[11] Hoeffner's alleged 2001 agreement to "reinstate" the 1997 Agreement also cannot serve as a ratification of the latter agreement, as VTI argues, because Hoeffner was still bound by the terms of the 1997 Agreement's two-year noncompetition provision in 2001. *See City of The Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.—Fort Worth 2008, pet. dism'd) ("Ratification is the adoption or confirmation, by one with knowledge of all material facts, of a prior act *which did not then legally bind that person* and which that person had *the right to repudiate*." (emphasis in original)). Ratification can also occur through conduct. *See Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.) ("In other words, a party ratifies a contract by conduct recognizing the contract as valid with knowledge of all relevant facts."). Here, Hoeffner's conduct cited by VTI— performance of his job duties after returning to VTI in 2001—establishes only that he returned to employment, not that he intended to ratify the 1997 covenant not to compete. VTI also points to various internal VTI records noting Hoeffner's hire date as 1997, but these were records created and kept by VTI, not Hoeffner.

15

off-limits to Hoeffner. Because the nonsolicitation provisions in the 1997 Agreement do not include reasonable restrictions, they are unenforceable. *See Marsh*, 354 S.W.3d at 771; *Ally Financial, Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038, at *8 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.) (holding overbroad non-solicitation covenant unenforceable because it "goes beyond what was necessary to protect Ally's goodwill or other business interest of Ally"). The trial court therefore abused its discretion when it included section (i) in the temporary injunction.

## III. Section (b), the trade secret section of the temporary injunction, violates Rule 683 because it is overbroad and vague.

In their remaining issues, appellants argue that the temporary injunction violates Rule 683 because it is vague, overbroad, and not supported by sufficient evidence. *See* Tex. R. Civ. P. 683 (establishing mandatory requirements for temporary injunction order). Because we have already held that the trial court abused its discretion when it included sections (f), (g), (i), and (j) in the temporary injunction, we focus our discussion of these issues on whether the remaining restriction challenged by appellants—section (b), quoted above—violates Rule 683. Because section (b) fails to give appellants notice of the specific acts prohibited and prevents appellants from using information that the evidence conclusively established was not VTI confidential information or trade secrets, we hold that section (b) is vague and overbroad, violates Rule 683, and must be reversed.[12]

---

[12] To the extent appellants argue that the trial court abused its discretion when it included section (b) in the temporary injunction because there is no evidence that appellants had possession of, and were using, VTI confidential information, we disagree. As set out above in the Background section, when viewed under the appropriate standard of review, there is evidence that (1) VTI had confidential information including, among other things, the contact information for key decision-makers at various VTI customers, distributors, and specifiers, development

16

Rule 683 provides that a temporary injunction must contain the reasons for its issuance, be specific in its terms, and describe in reasonable detail the acts restrained by the order without reference to any other document. *Id.* These requirements ensure that an enjoined party is given adequate notice of the acts it is enjoined from doing. *Rugen*, 864 S.W.2d at 552. A temporary injunction should inform a party of the acts he is restrained from doing without requiring inferences or conclusions about which persons might disagree and which might require additional court hearings. *Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220–21 (Tex. App.—Dallas 2005, no pet.).[13] Although a temporary injunction should be broad enough to safeguard a party's protectable interests pending a trial on the merits, it should not be so broad that it prohibits the restrained party from engaging in lawful activities that are a proper exercise of its rights. *Sharma*, 231 S.W.3d at 429; *Computek Computer & Office Supplies, Inc.*, 156 S.W.3d at 221.

Appellants initially argue that section (b) violates Rule 683 because it is vague. Appellants assert that section (b) is impermissibly vague because it

---

information for products such as trunnion valves, and financial data such as profit margins for VTI products; and (2) Hoeffner was willing to reveal some of that information to Cooper, his new employer. Threatened misappropriation of trade secret information will support a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.003 (West Supp. 2016) ("Actual or threatened misappropriation may be enjoined."); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.) ("The threatened disclosure of trade secrets constitutes irreparable injury as a matter of law."). This same evidence also makes it unnecessary to address appellants' arguments that the trial court improperly relied on the so-called "inevitable disclosure" doctrine. *See DGM Serv., Inc. v. Figueroa*, No. 01-16-00186-CV, 2016 WL 7473947, at *5–6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2016, no pet.) (surveying Texas cases discussing inevitable disclosure doctrine and concluding it was unnecessary to decide whether doctrine applied to case).

[13] Given this principle, the injunction's provision permitting appellants, "upon motion and hearing, [to] request an order from the Court to determine whether particular documents or information are or constitute Confidential and Trade Secret Information" cannot cure any Rule 683 deficiencies.

17

prohibits them from "possessing, selling, disclosing, or using" VTI's "Confidential and Trade Secret Information," which according to the injunction "includes, but is not limited to," a two-page list of items. We agree that this open-ended definition of "Confidential and Trade Secret Information" is impermissibly vague, fails to provide adequate notice to appellants of the acts they are restrained from doing in terms not subject to reasonable disagreement, and therefore violates Rule 683's specificity requirement. *See Ramirez v. Ignite Holdings, Ltd.*, No. 05-12-01024-CV, 2013 WL 4568365, at \*4 (Tex. App.—Dallas Aug. 26, 2013, no pet.) (mem. op.) (holding temporary injunction violated Rule 683 because it failed to define "Proprietary Information/Trade Secrets with enough specificity to give appellants notice of the acts they are restrained from doing").

We further conclude that section (b) of the temporary injunction is impermissibly overbroad because it prohibits appellants from "possessing, copying, selling, disclosing, or using any of" the "[i]nformation regarding the actual customers of [VTI] listed on the attached Exhibits 1 and 1-A." As mentioned above, Exhibits 1 and 1-A are two sealed lists containing the names of more than 1,800 entities worldwide that appellants are enjoined from possessing or using. Appellants argue that the inclusion of these two lists violates Rule 683 because the record conclusively shows that it is not the names of these entities that VTI considers to be confidential. Appellants also argue that the temporary injunction is overbroad because it includes within the list entities that the evidence established were pre-existing Cooper clients. We agree with both contentions.

Exhibits 1 and 1-A contain the names of VTI's customers, distributors, and specifiers. They do not contain the names of "key decision-makers" at VTI's customers, distributors, and specifiers whom VTI contacts regarding VTI business. According to VTI's CEO Hunt, it is the identity and contact information of the

18

"key decision-makers" that VTI considers to be trade secrets and that it sought to protect against disclosure and use by appellants. Although there is evidence to support a finding that the identity and contact information of "key decision-makers" are entitled to trade secret protection pending a trial on the merits, there is no evidence to support the trial court's blanket inclusion of more than 1,800 entities listed on Exhibits 1 and 1-A in the temporary injunction's definition of "Confidential and Trade Secret Information." The temporary injunction is also overbroad because the evidence conclusively shows that Exhibits 1 and 1-A contain the names of entities with which Cooper did business before hiring Hoeffner and without using any VTI confidential information. We therefore hold that section (b) violates Rule 683 and the trial court abused its discretion when it included that section in the temporary injunction. *See Dickerson v. Acadian Cypress & Hardwoods, Inc.*, No. 09-13-00299-CV, 2014 WL 1400659, at \*7 (Tex. App.—Beaumont April 10, 2014, no pet.) (mem. op.) (concluding temporary injunction violated Rule 683 because it failed to adequately define the "current clients" restrained party could not contact); *Computek Computer & Office Supplies, Inc.*, 156 S.W.3d at 221–23 (holding permanent injunction violated Rule 683 because order failed to specifically identify clients restrained party could not contact and also prohibited activities restrained party had legal right to perform).

## CONCLUSION

Having sustained appellants' issues on appeal, we reverse sections (b), (f), (g), (i), and (j) of the trial court's temporary injunction order. We remand this matter to the trial court for further proceedings consistent with this opinion, including consideration of protections for confidential information that comply with Rule 683 as well as consideration of what impact, if any, Cooper's termination of Hoeffner has on VTI's application for injunctive relief. *See*

19

*Bellefeuille v. Equine Sports Med. & Surgery*, No. 02-15-00268-CV, 2016 WL 1163364, at *8 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.) (reversing overly broad and vague sections of temporary injunction); *Dickerson*, 2014 WL 1400659, at *8 (reversing temporary injunction and remanding to trial court for further proceedings).[14]  We further instruct the clerk of this Court to issue the mandate immediately.  *Helix Energy Sol. Grp., Inc.*, 452 S.W.3d at 45.


/s/      J. Brett Busby
            Justice


Panel consists of Justices Christopher, Busby, and Jewell.

---

[14] Because we are remanding for further proceedings regarding the restrictions imposed, we do not reach VTI's request that we reform the temporary injunction.  *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298–99 (Tex. App.—Beaumont 2004, no pet.) (reversing and remanding overbroad temporary injunction rather than reforming because "the record is unclear who Wright's customers were when he worked for SSG.").