**AFFIRM; and Opinion Filed August 5, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00617-CV

**MARK SMITH, MARK & TAMMY SMITH, LLC,**
**TEE DANIEL, AND DARIN KIDD, Appellants**
**V.**
**NERIUM INTERNATIONAL, LLC, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-03726**

## MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Whitehill

This is an interlocutory appeal from a temporary injunction.

Appellants were formerly associated with appellee Nerium International, LLC, a multi-

level marketing. After they left Nerium and joined a competitor, Nerium sued appellants and

obtained a temporary injunction prohibiting them from recruiting or soliciting any of Nerium's

sales force to join any other direct sales, multi-level, or network marketing company.

Appellants raise six issues on appeal. The case largely concerns the nature and extent of

(i) benefit a multi-level marketing company provides for its independent contractor sales force and

(ii) such company's interest in protecting its relationships with its sales force. Based on the record

before us, we conclude that the evidence was sufficient for the trial court to conclude at this early

stage that a temporary injunction was warranted. Accordingly, we reject appellants' issues and affirm without opining on the case's ultimate outcome.

## I. BACKGROUND

### A. Facts

Except as otherwise noted, we draw the following facts from the evidence admitted at the temporary injunction hearing.

#### 1. Nerium and Its Policies and Procedures

Nerium International, LLC, is a multi-level marketing company that sells skin care and wellness anti-aging products. Nerium started in August 2011 in the United States and now operates in twelve countries.

Nerium relies on independent contractors called "brand partners" (BPs) to sell its products to customers and to recruit other BPs. A BP's recruits, and all recruits who flow from those recruits, make up the BP's "downline." BPs receive commissions on both their own sales and their downline's sales.

A new BP receives a launch kit that includes brochures for customers and training materials. A new BP also gets a personalized web site that he or she can use to enroll both customers and new BPs. Most Nerium product orders come through the BPs' websites. Nerium BPs may work as much or as little as they want. They do not have assigned sales territories and can market anywhere in the world through social media. BPs also get computer access to "the back office," which (i) gives them access to marketing materials and training and (ii) shows them sales performance data for themselves and everyone on their teams. They also have access to ongoing training, public relations supports, promotions, incentives, and other events.

BPs must comply with the terms found in the Nerium policies and procedures manual.

This case involves § 11.06 of Nerium's policies and procedures, which concerns solicitation and competition. The case particularly focuses on the following non-solicitation clause:

> [I]n consideration for all of the rights granted by this Agreement, including the protection this non-solicitation provision affords to Brand Partner, for the term of this Agreement and for two (2) years after termination hereof, for any reason, Brand Partner agrees not to, directly or indirectly, recruit or solicit any of Company's other Brand Partners to join other direct sales, multi-level or network marketing companies.

### 2. Appellants' Relationships with Nerium

Appellant Mark Smith joined Nerium in 2011 soon after it launched. Smith and his wife later formed Mark & Tammy Smith, LLC.

Smith became acquainted with Nerium founder and CEO Jeff Olson when they were both working with a different multi-level marketing company called Prepaid Legal Services. When he was preparing to start Nerium, Olson reached out to Smith and asked him to join Nerium.

Smith testified that he and Olson agreed that Smith and his wife would each get 5% equity in Nerium, they would receive 15% of the "back office fees," and they would be considered "master distributors" entitled to a percentage of revenue.

Smith succeeded at Nerium, working his way up to the level of "diamond national marketing director" and "gold international marketing director." In less than seven years with the company, he received compensation of approximately $14 million. Smith was featured in many Nerium videos and at "huge" Nerium events both in the United States and abroad.

Appellant Darin Kidd became a Nerium BP in 2011 and a Nerium five star national marketing director.

Appellant Tee Daniel's wife, Cassie, started with Nerium in 2012. Daniel himself became a Nerium BP no later than 2016 and became a Nerium one star national marketing director.

By early 2018, Smith was unhappy at Nerium and was thinking about leaving. In early March 2018, Smith, Kidd, and others visited another company called Jeunesse. According to the parties' briefs, Jeunesse is also a "multi-level marketing" or "network-marketing" company.

On or about March 13, 2018, Smith and Kidd "enrolled" with Jeunesse. Cassie Daniel signed up with Jeunesse in mid-March, and Tee Daniel engaged in marketing and training to support Cassie's Jeunesse account.

## B.      Procedural History

On March 20, 2018, Nerium sued Smith, Mark & Tammy Smith, LLC, and others.

Several days later, Nerium filed an amended petition that added Kidd and others as defendants.

On April 24, 2018, Nerium filed a second amended petition that added Daniel and others as defendants. That petition included claims against appellants for contract breach and tortious interference with contract, and it requested injunctive relief. That same day, the trial judge signed a temporary restraining order against appellants.

The trial judge held an evidentiary temporary injunction hearing at which Amber Rourke (Nerium's chief marketing officer) and appellant Smith testified.

After the hearing, the trial judge signed a temporary injunction, which provides:

> The Injunction Restrained Parties [i.e., appellants and certain categories of people affiliated with them] are prohibited from directly or indirectly recruiting or soliciting any of Nerium's Brand Partners to join any other direct-sales, multi-level marketing, or network-marketing company, including but not limited to Jeunesse Global Holdings, LLC.

This interlocutory appeal followed.

## II.  LAW OF TEMPORARY INJUNCTIONS AND STANDARD OF REVIEW

A temporary injunction is an extraordinary remedy granted to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d

198, 204 (Tex. 2002). It does not issue as a matter of right. *Id.* Rather, the applicant must plead and prove the following elements: (i) a cause of action against the defendant, (ii) a probable right to the relief sought, and (iii) a probable, imminent, and irreparable injury in the interim. *Id.*

Appellants don't contest the first element, so we start with the probable right to recovery element. That element does not require the applicant to show that it will prevail at trial, nor does it require the trial court to evaluate the probability that the applicant will prevail at trial. *Austin v. Mitchell*, No. 05-18-00052-CV, 2018 WL 2949443, at *3 (Tex. App.—Dallas June 13, 2018, no pet.) (mem. op.); *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Rather, it requires the applicant to present enough evidence to raise a bona fide issue as to its right to ultimate relief. *Austin*, 2018 WL 2949443, at *3. This requires the applicant to produce some evidence supporting every element of at least one valid legal theory. *Id.*; *Tex. Health Res. v. Pham*, No. 05-15-01283-CV, 2016 WL 4205732, at *3 (Tex. App.—Dallas Aug. 3, 2016, no pet.) (mem. op.).

The irreparable injury requirement is sometimes described in terms of the injured party having an inadequate legal remedy. *See Butnaru*, 84 S.W.3d at 211 ("[A] party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available."); *see also id.* at 204 ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.").

We review a temporary injunction for abuse of discretion. *Id.* The trial court abuses its discretion if (i) it misapplies the law to established facts or (ii) the evidence does not reasonably support the court's determinations as to probable right of recovery or probable injury. *Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.). In our review, we draw all legitimate inferences from the evidence in the light most favorable to the order, and the trial

court does not abuse its discretion if it makes a decision based on conflicting evidence. *Id.* We review any legal determinations de novo. *Id.*

## III. ANALYSIS

**A.** **Issue One: Did the trial court abuse its discretion by failing to conclude that the non-solicitation clause is unreasonable and therefore unenforceable?**

Appellants argue that Nerium failed to show a probable right to recover because the non-solicitation clause is unreasonable, and therefore unenforceable, for several reasons. But first we address two procedural issues that Nerium raises.

### 1. Is enforceability a relevant issue at the temporary injunction stage?

In a supplemental letter brief, Nerium suggests that we recently held that a non-solicitation agreement's (un)enforceability is not a relevant consideration in determining whether the applicant has shown a probable right of recovery. *See White v. Impact Floors of Tex., LP*, No. 05-18-00384-CV, 2018 WL 6616973, at *5 (Tex. App.—Dallas Dec. 18, 2018, no pet.) (mem. op.). Thus, Nerium suggests, we should decline to consider appellants' arguments that the non-solicitation agreement in this case is unenforceable. Appellants disagree.

Because we conclude for the reasons discussed below that the trial court could reasonably rule that this non-solicitation clause is enforceable, we need not decide whether Nerium's interpretation of *White* is correct.

### 2. Which side bears the burden of proof on § 15.50's enforceability criteria?

Under Texas law, the general rule regarding covenants not to compete is this:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE § 15.50(a). Which party bears the burden of proof on these criteria depends on the facts of the case:

> If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, for a term or at will, the promisee has the burden of establishing that the covenant meets the criteria specified by Section 15.50 of this code. If the agreement has a different primary purpose, the promisor has the burden of establishing that the covenant does not meet those criteria.

*Id*. § 15.51(b).

Nerium argues that (i) § 15.51(b) applies at the temporary injunction stage of the case, (ii) under § 15.51(b), appellants bore the burden of proof to negate the § 15.50(a) criteria, and (iii) because the criteria are defensive matters in this case, the trial court has the discretion to defer considering them at all at the temporary injunction stage. Appellants disagree, arguing that Nerium bore the burden of proof on the § 15.50(a) criteria because (i) § 15.51(b)'s burden-shifting provisions do not apply at the temporary injunction stage and (ii) even if § 15.51(b) applies at the temporary injunction stage, Nerium still bore the burden of proof.

As will be seen below, we conclude that Nerium adduced sufficient evidence of the § 15.50(a) enforceability criteria to support the temporary injunction. Accordingly, for purposes of this appeal, we assume without deciding that Nerium bore the burden of proof on the § 15.50(a) criteria.

### 3. The Law Governing Covenants Not to Compete

By statute, the general rule is that every contract "in restraint of trade or commerce" is unlawful. *Id*. § 15.05(a). "Trade" is broadly defined and includes not only the sale of services but also any economic activity that (i) is undertaken in whole or in part for financial gain and (ii) involves or relates to goods or services. *Id*. § 15.03(5). Nerium does not dispute that the non-solicitation agreement involved here is a contract in restraint of trade.

Section 15.50, discussed above, excepts from § 15.05 covenants not to compete that meet certain criteria. *Id*. § 15.50.

Appellants contend, and Nerium does not dispute, that the non-solicitation agreement in this case—which forbids appellants from soliciting Nerium's BPs—are legally equivalent to covenants not to compete. Although the statute does not define "covenant not to compete," the supreme court holds that a covenant restricting former employees from soliciting their "former employers' customers *and employees*" is a restraint of trade subject to § 15.50. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (emphasis added); *see also Exxon Mobil Corp. v. Drennan*, 452 S.W.3d 319, 327 (Tex. 2014) (quoting *Marsh*).

Here, Nerium doesn't have salespeople as employees but instead relies solely on its independent BPs for customer sales. Thus, recruiting current Nerium BPs to work for another company is itself a form of competing with Nerium—competing for salespeople, not directly for customers or clients. Consistent with *Marsh* and its progeny, we hold that appellants' agreement not to solicit Nerium's BPs is a covenant not to compete covered by § 15.50.

Section 15.50(a) makes non-competition covenants enforceable if certain criteria are met. The threshold requirement is that the covenant must be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." BUS. & COM. § 15.50(a); *see also Marsh*, 354 S.W.3d at 771, 773. Moreover, the supreme court has said that the "otherwise enforceable agreement" must give rise to "an interest worthy of protection" or reasonably relate to the promisee's "legitimate interest being protected."[1] *See Marsh*, 354 S.W.3d at 775, 778. "Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App.—Tyler 2016, no pet.).

---

[1] *Marsh* describes this additional requirement as a "common law requirement that . . . bolsters the ancillary requirement." 354 S.W.3d at 776. It is not clear how this common law requirement interacts with § 15.52, which provides that § 15.50's enforceability criteria are exclusive and preempt any other criteria, including common law criteria. BUS. & COM. § 15.52.

If this threshold requirement is met, the covenant is enforceable "to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that [i] are reasonable and [ii] do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." BUS. & COM. § 15.50(a) (romanettes added). These standards are the same as existed at common law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 854 (Tex. 2009).

### 4. Did Nerium show that it has a legitimate business interest in protecting its BPs from being solicited by appellants?

Yes, Nerium adduced evidence that its non-solicitation agreements were justified by its legitimate business interests, including protecting its goodwill and confidential information.

Appellants argue under issues one and two that Nerium has no legitimate business interest in preventing them from soliciting Nerium BPs. They cite Nerium's own policies and procedures as evidence that BPs (and not Nerium) are responsible for recruiting, training, and supervising other BPs. They also state that BPs are free to disregard the training and marketing materials that Nerium offers them. They argue that BPs "work first and foremost for themselves, not for Nerium." Thus, appellants conclude, Nerium has made no investment in its BPs that it has a legitimate interest in protecting from solicitation.

We disagree with appellants' position. In *Marsh*, the court recognized that goodwill is a protectable interest under § 15.50(a), and it held that the non-competition and non-solicitation agreement in that case sought to protect the employer's goodwill in the form of "relationships that the company has developed with its customers *and employees and their identities*, due in part to [the employee's] performance." 354 S.W.3d at 777 (emphasis added). *Marsh* also quoted *Black's Law Dictionary*'s definition of goodwill as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business." *Id*. at 778 (quoting BLACK'S LAW DICTIONARY 703 (7th ed. 1999)). Nerium presented evidence that its goodwill was important

for its success and that it had invested time and money into building its brand through publicity, website, social media marketing materials, community involvement, and the quality of Nerium's products themselves. Additionally, Nerium both built its goodwill and facilitated its BPs' success by providing the BPs with training, marketing materials, products, and personalized websites.

We also agree that Nerium introduced some evidence showing that it provided confidential information to its BPs. *See id.* at 775 (identifying confidential information as a possible interest worthy of protection). Specifically, Nerium gave its BPs access to a computerized "back office" through which BPs could obtain non-public information about their own and their downline BPs' performance. By using the back office, BPs could tell which members of their downlines were performing well and which ones weren't.

Appellants argue that Nerium's goodwill, in the form of its salesforce of BPs, is not a protectable interest because the BPs built that salesforce, not Nerium. But appellants acknowledge that Nerium provided a "platform" for the BPs to build their businesses and downlines. There was evidence that Nerium contributed many things useful for a BP seeking to build a business, such as training, marketing materials, internet resources, and of course the products themselves and the Nerium brand. Additionally, the back office gave BPs access to confidential information that BPs could use to grow their businesses by identifying BPs in their downlines who needed help. The trial court could reasonably conclude that Nerium's goodwill was a legitimate business interest worthy of protection.

Appellants also argue that Nerium's confidential information is not a protectable interest because that information is adequately protected by a nondisclosure agreement in the policies and procedures. But Nerium seeks to enforce its non-solicitation clause to prevent appellants from competing with Nerium, not to prevent them from disclosing confidential information. Although there was evidence that the identities of at least some Nerium BPs could be obtained from public

–10–

sources, confidential information in Nerium's back office revealed to appellants which Nerium BPs in their downlines were the most successful ones and, thus, the ones most valuable to Nerium and most worth recruiting.

We conclude that the evidence supported a finding that Nerium had legitimate, protection-worthy business interests in preventing appellants from soliciting Nerium BPs.

**5.      Is the non-solicitation clause unreasonable to the extent it prevents appellants from recruiting Nerium BPs that they do not know and had no contact with during appellants' tenures at Nerium?**

Next, appellants argue that the non-solicitation clause is overbroad and unreasonable to the extent it bars appellants from soliciting Nerium BPs that they do not know and had no contact with while they were at Nerium.

Nerium responds that it is reasonable to bar appellants from contacting all Nerium BPs.

We agree with Nerium that the trial court could have appropriately found the clause reasonable at this stage because appellants had access to confidential information about Nerium's other BPs, appellants would have enhanced credibility in recruiting Nerium BPs because of appellants' prominence in the company, and even BPs who joined Nerium after appellants left would have access to Nerium's confidential information and goodwill.

#### a.      Law Concerning Overbreadth and Unreasonableness

Most decided cases involve clauses that restrain former employees from soliciting their former employers' clients. In such cases, Texas courts hold that the clauses are overbroad and unreasonable if they forbid the former employees from soliciting clients (i) that were acquired after the employee left or (ii) that the former employee had no contact with while working for the former employer. *E.g.*, *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387–88 (Tex. 1991).

–11–

Only a few cases address the reasonableness of clauses that forbid the solicitation of a former employer's employees rather than its clients.[2] Nerium cites two federal district court opinions holding that a non-solicitation clause extending to all current employees is a reasonable protection of the employer's interest in maintaining its employees and thus is not overbroad. *Everett Fin., Inc. v. Primary Residential Mortg., Inc.*, No. 3:14-CV-1028-D, 2016 WL 7378937, at *8 (N.D. Tex. Dec. 20, 2016); *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 639–40 (N.D. Tex. 2015), *aff'd*, 861 F.3d 143 (5th Cir. 2017).

On the other hand, appellants rely on two recent decisions by our sister courts: (i) *Ally Financial, Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.) and (ii) *Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

In *Ally Financial*, Gutierrez was a supervisor in Ally's IT department, and she agreed not to solicit or employ any of Ally's employees for two years after leaving. 2014 WL 261038, at *1. She left Ally's employ and went to work for a competitor, Ally sued her for soliciting Ally's employees, and Gutierrez won summary judgment. *Id*. at *2, 4. The court of appeals affirmed, holding that the non-solicitation agreement was unenforceable because it was unreasonable in scope:

> While it might be considered reasonable to limit Gutierrez's solicitation of Ally's employees located in the IT department, which was where Gutierrez worked, the non-solicitation covenant in the [contract] was not so limited. . . . This covenant goes beyond what was necessary to protect Ally's goodwill or other business interest of Ally.

*Id*. at *8. Unlike *Ally*, the temporary injunction here is limited to only Nerium's sales force and does not apply to every Nerium employee.

---

[2] We recognize that Nerium BPs are independent contractors rather than employees, but the Nerium–BP relationship is at least analogous to the employer–employee relationship. To the extent we refer in this opinion to Nerium and its BPs as "employer" and "employees," we do so only for convenience and not to suggest that BPs are legally employees.

The *Cooper Valves* case adds nothing to the *Ally Financial* analysis. In *Cooper Valves*, a former employee agreed not to solicit any then-current employee of his former employer, VTI. 531 S.W.3d at 258. VTI sued the former employee and obtained a temporary injunction barring him from soliciting any then-current VTI employee. *Id.* at 262. The court of appeals reversed, holding that the non-solicitation provision was unenforceable because it contained no restrictions as to time, geography, or types of employees that were off-limits. *Id.* at 265.

### b. The trial court could reasonably conclude that the non-solicitation clause is reasonable.

Appellants argue that Nerium's legitimate interest in protecting its BP salesforce extends no further than those relationships that Nerium played some role in forming. According to appellants, it is unreasonable to bar them from soliciting a BP if they had no contact with a particular BP while they were both at Nerium, or if a BP joined Nerium after that appellant left. They especially rely on *Ally Financial* to support the premise that a non-solicitation covenant must be limited to employees with whom the defendant had contact. *See* 2014 WL 261038, at *8.

Nerium argues that the non-solicitation clause's scope is reasonable because a clause limited to BPs that appellants knew or had dealt with would be difficult or impossible to enforce. Nerium contends that there is no way to verify whether an appellant knew a particular BP and that appellants could easily feign ignorance of whether a recruit is a Nerium BP. Nerium also identifies evidence that BPs might know the appellants through Nerium events and conference calls even if the appellants don't know the BPs.

In reply, appellants argue that ease of application is not the test for reasonableness and enforceability. They reiterate that Nerium has no legitimate interest in barring appellants from recruiting BPs that appellants had no contact with while appellants worked for Neirum or that joined Nerium after appellants left.

–13–

We conclude that the trial court could reasonably determine that the non-solicitation clause does not impose a greater restraint than necessary to protect Nerium's legitimate business interests. As to BPs who worked for Nerium at the same time appellants did, the restraint is reasonable because appellants had access to the Nerium back office and could thereby learn which BPs in their downlines were the most successful and the most desirable to recruit even if appellants did not personally know the BPs. Also, appellants could have enhanced credibility in the eyes of Nerium BPs that they never personally met because appellants appeared on Nerium's behalf at various events attended by Nerium BPs. This further distinguishes *Ally Financial* from the present case in which the injunction is not company-wide but instead applies more narrowly to the types of employees that appellants' knowledge and relationships could exploit. We conclude that the trial court could reasonably decide that Nerium has a legitimate interest in restraining appellants from recruiting BPs who worked for Nerium at the same time as appellants.

The trial court could also reasonably conclude that Nerium has a legitimate interest in restraining appellants from recruiting BPs who joined Nerium after appellants cut their ties with Nerium. Because these new BPs would acquire Nerium's confidential information and make use of its goodwill as soon as they joined the company, the trial court could reasonably decide that Nerium has a legitimate interest in restraining appellants from recruiting them. *See Everett Fin.*, 2016 WL 7378937, at *8 ("an employee non-solicitation covenant extending to all current employees is a reasonable protection of the employer's interest in maintaining its employees").

### 6. Is the non-solicitation clause overbroad because it is not limited to a relevant industry, a relevant geographic area, or a reasonable duration?

Finally, appellants argue that the non-solicitation clause is overbroad because it is not limited to a relevant industry or geographic area or to a reasonable duration. We disagree.

### a. Relevant Industry

First, appellants argue that the clause is unreasonably broad because it is not limited to any particular industry. Rather, it bars appellants from recruiting Nerium BPs to work for any other direct sales, multi-level, or network marketing company, regardless of what that company sells. Appellants rely on our precedent that "[a]n industry-wide bar is unreasonable." *U.S. Risk Ins. Grp., Inc. v. Woods*, 399 S.W.3d 295, 301 (Tex. App.—Dallas 2013, no pet.) (citing *Haass*, 818 S.W.2d at 386–88). In *U.S. Risk*, for example, we held invalid a clause that barred the former employee from working for any business that competed in the business engaged in by his former employer's parent company or any of its subsidiaries. *Id*.

Nerium responds that its non-solicitation clause isn't an "industry-wide bar." Under its clause, appellants can work for any company in any industry they choose, and they can recruit anyone they please—except for Nerium BPs.

We agree with Nerium. This clause does not bar appellants from selling products that compete directly with Nerium's, from working for a competing multi-level marketing company, or from recruiting salespeople for such a company. It restrains appellants only from recruiting Nerium BPs. Thus, the clause is not an industry-wide bar, and we reject appellants' argument.

### b. Relevant Geographic Area

Next, appellants argue that the non-solicitation clause is unenforceable because § 15.50(a) requires such a clause to have a reasonable geographic limitation but this clause contains no geographic limitation at all.

Nerium responds that the Texas Supreme Court has upheld a covenant that expressly applied "regardless of geographic location." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 656–57 (Tex. 2006). But it does not appear that the former employee attacked the

covenant on that basis, so the supreme court did not consider whether the lack of a geographic limitation was a problem. *See id.* Thus, the *Alex Sheshunoff* case is unhelpful.

Nerium also responds that some courts have held that other limitations can substitute for a missing geographic limitation. In particular, "[a] number of courts have held that a non-compete covenant that is limited to the employee's clients is a reasonable alternative to a geographical limit." *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

At first glance, Nerium's argument seems counter to our holding that a non-competition covenant containing no geographical limitation is unenforceable. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660–61 (Tex. App.—Dallas 1992, no writ); *see also Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 662–63 (Tex. 1990) (unenforceable covenant with no limits on geographic area or scope of activity); *Gen. Devices, Inc. v. Bacon*, 888 S.W.2d 497, 503–04 (Tex. App.—Dallas 1994, writ denied) (covenant with no geographic limitation and no definite duration was unenforceable).

But these cases are distinguishable. Each case involved a typical covenant not to compete for the former employer's clients or customers. *Juliette Fowler Homes*, 793 S.W.2d at 662; *Bacon*, 888 S.W.2d at 503; *Zep Mfg.*, 824 S.W.2d at 660. This case, however, involves a covenant not to compete for the former employer's salespeople. Given Nerium's structure, appellants' downlines could include BPs located virtually anywhere. And because people can move, the BPs will not necessarily stay in any particular location. Indeed, at the time of the temporary injunction hearing, Nerium was operating in the United States and eleven other countries. Thus, the trial court could have reasonably concluded that crafting a suitable geographic restriction for this non-solicitation clause was not feasible.

Because Nerium's interest is in protecting its salesforce and goodwill, and because Nerium's BPs are widespread and inherently mobile, restraining appellants from soliciting Nerium's BPs the trial court could have concluded that its order was a reasonable alternative to restraining appellants from competing in a particular geographic area. *See Vogelsang*, 312 S.W.3d at 655. As in *Vogelsang*, appellants can work anywhere in the world and can work in the same industry as Nerium; they simply cannot solicit Nerium's BPs to work for another direct sales, multi-level, or network marketing company.

Accordingly, we reject appellants' argument.

### c. Reasonable Duration

Finally, appellants argue that the non-solicitation clause's two-year duration is unreasonably long. But "[t]wo to five years has repeatedly been held as a reasonable time in a noncompetition agreement." *Vogelsang*, 312 S.W.3d at 655; *see also Weber v. Hesse Envelope Co.*, 342 S.W.2d 652, 655 (Tex. App.—Dallas 1960, no writ) (two-year period "well within the period generally upheld as enforceable"). Appellants cite no authority or record evidence tending to show that two years is unreasonable here. We thus conclude that appellants have not shown an abuse of discretion.

### 7. Conclusion

For the preceding reasons, we overrule appellant's first issue.

**B.** **Issue Two: Did the trial court abuse its discretion by failing to conclude that the non-solicitation clause is unenforceable because Nerium provided no consideration reasonably related to an interest worthy of protection?**

Under issue two, appellants reiterate their argument that the non-solicitation clause is unenforceable because Nerium lacks a legitimate business interest in its salesforce. We have already rejected that argument in Part III.A.4 above.

Appellants also argue that the non-solicitation covenant is unenforceable because Nerium neither promised nor gave appellants consideration that is reasonably related to a legitimate business interest that Nerium seeks to protect. We disagree because there is evidence that Nerium furnished appellants with goodwill and confidential information, which are both interests worthy of protection.

### 1. Applicable Law

As previously noted, the supreme court holds that the "otherwise enforceable agreement" must give rise to "an interest worthy of protection" or reasonably relate to the promisee's "legitimate interest being protected." *See Marsh*, 354 S.W.3d at 775, 778. Thus, "the consideration given by the employer in the [otherwise enforceable] agreement [must be] reasonably related to an interest worthy of protection." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App.—Tyler 2016, no pet.).

Goodwill is an interest worthy of protection. *Marsh*, 354 S.W.3d at 778; *see also* BUS. & COM. § 15.50(a). Confidential or proprietary information, trade secrets, customer information, and specialized training are other examples of interests that can be, in appropriate circumstances, worthy of protection. *Neurodiagnostic Tex*, 506 S.W.3d at 164.

### 2. Applying the Law to the Facts

Nerium argues that it gave appellants essentially two kinds of consideration that are reasonably related to Nerium's interest in guarding its salesforce. First, it gave appellants "Brand Partner status," which included the rights to market themselves as Nerium BPs, sell Nerium products, build a downline, network with other BPs at "massive national events put on by" Nerium, and make money on their sales and their downlines' sales. Nerium posits that these interests are strengthened by the non-solicitation clause because the clause protects BPs from having their

–18–

downlines recruited away. Second, Nerium argues that it gave appellants confidential information, specifically the detailed information about their downlines available in the back office.

Appellants argue that the first kind of consideration is inadequate because it is nothing more than giving appellants a job, and merely giving someone a job opportunity will not support a covenant not to compete. However, even if appellants' assessment of the law were correct, we disagree with their application of it to the evidence. Nerium adduced evidence from which the trial court could have reasonably found that Nerium provided appellants more than just products and marketing materials. It also encouraged BPs to network, to function as a team, and to attend company events. As the supreme court said in *Marsh*, a company can seek a non-competition agreement to protect its goodwill, including the relationships the company has developed with its employees. 354 S.W.3d at 777. Nerium undertook to build its BPs into a unified team, and its non-solicitation clause is reasonably related to that goodwill. More fundamentally, Nerium provides a marketable and apparently desirable brand to sell.

Additionally, appellants argue that Nerium's confidential information cannot satisfy the consideration requirement either. They assert that (i) confidential information can serve as consideration only if departing employees retain the confidential information and can take it to a competitor and (ii) appellants no longer have access to Nerium's confidential information, which is stored in Nerium's back office. Again assuming that appellants' statement of the law is correct, we disagree with their application of it to this case. The confidential information in Nerium's back office consists of performance data concerning the BPs in appellants' downlines. This was information that appellants could use to improve their downlines' performance and thus to enhance their own compensation. The trial court could reasonably conclude that this consideration was related to Nerium's business interest in protecting its salesforce from poaching. Moreover, although appellants may have lost direct access to the back office when they quit Nerium, they

could have made notes or simply remembered information that would give them a competitive advantage—specifically, information about who the best salespeople were and thus who should be targeted for recruitment.

Appellants also argue that the supposedly confidential information is not confidential because the identities of Nerium's BPs are public information. But there was evidence that the back office also contains nonpublic information about the BPs' performances, and this information is quite relevant to Nerium's interest in protecting its salesforce.

### 3.     Conclusion

We conclude that the trial court could reasonably determine that Nerium provided consideration that was reasonably related to protecting its goodwill and its salesforce. We thus overrule appellants' second issue.

### C.     Issue Three:  Did the trial court abuse its discretion by issuing a temporary injunction that prohibits certain conduct that the parties' contract expressly allows?

Next, appellants argue that the non-solicitation clause is inconsistent with another much less restrictive provision in Nerium's policies and procedures and that the trial court erred by not incorporating the other provision's terms into the temporary injunction.

Nerium argues that appellants are misinterpreting the other provision and that the trial court did not err.

We agree with Nerium because its contract interpretation is reasonable and the trial court could reasonably have decided to maintain the status quo consistent with that interpretation.

### 1.     The Law of Contract Interpretation

When we interpret a contract, our goal is to ascertain the parties' intent as expressed in the instrument. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757 (Tex. 2018); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 55 (Tex. App.—Dallas 2006, pet. denied). Objective, not subjective, intent controls. *URI, Inc.*, 543 S.W.3d at 757.

Thus, "our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean."  *Id*. at 764.

"We give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."  *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 594–95 (Tex. App.—Dallas 2015, pet. denied).

"The use of different language in different parts of a contract generally means that the parties intended different things."  *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 708 (Tex. App.—Dallas 2011, pet. denied).

"We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) (internal quotation and citation omitted); *accord Hackberry Creek*, 205 S.W.3d at 55.

If contract provisions conflict, we apply rules such as the following: "(1) specific provisions control over general provisions; (2) provisions stated earlier in an agreement are favored over subsequent provisions; and (3) the interpretation of an agreement should not render any material terms meaningless."  *Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 462 (Tex. App.—Dallas 2007, no pet.).

The interpretation of an unambiguous contract is a question of law for the court.  *In re Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 122 (Tex. 2018); *Hackberry Creek*, 205 S.W.3d at 56. A contract is ambiguous if it has more than one reasonable interpretation after we apply the pertinent rules of construction.  *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018); *Hackberry Creek*, 205 S.W.3d at 56.  The question of whether a contract is ambiguous is also a question of law for the court.  *ConocoPhillips Co.*, 547 S.W.3d at 874; *Hackberry Creek*, 205 S.W.3d at 56.  But, the interpretation of an ambiguous contract is a question of fact.  *See Royal*

*Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 346 (Tex. App.—Dallas 2004, pet. denied) ("Once a contract is found to be ambiguous, the interpretation of the contract becomes a fact issue."); *accord Hackberry Creek*, 205 S.W.3d at 56.

### 2. Applying the Law to the Facts

Appellants argue that the trial court erroneously interpreted Nerium's policies and procedures by failing to give effect to § 1.16, which they contend allows them to promote a competing company like Jeunesse to Nerium's BPs that appellants had personally sponsored. Nerium disagrees with appellants' contract interpretation. We reject appellants' argument because (i) the two sections are not necessarily incongruent and (ii) the trial court could have reasonably concluded that temporary injunctive relief was proper to maintain the status quo.

For convenience, we place the relevant provisions side by side:

| § 1.16 | § 11.06 |
| --- | --- |
| **1.16 Other Products.** . . . During the term of the Brand Partner Agreement, and for a period of six months thereafter, Brand Partner is prohibited from selling or promoting any competing products or services or marketing programs to any of [Nerium's] Brand Partners, except those Brand Partners personally sponsored by Brand Partner. | **11.06 Non-Solicitation and Non-Competition**. . . . [F]or the term of this Agreement and for two (2) years after termination hereof, for any reason, Brand Partner agrees not to, directly or indirectly, recruit or solicit any of [Nerium's] other Brand Partners to join other direct sales, multi-level or network marketing companies. |

According to appellants, § 1.16 means that upon quitting Nerium they could immediately start promoting Jeunesse, a "marketing program," to Nerium BPs that appellants had personally sponsored. If § 1.16 and § 11.06 conflict and thereby create an ambiguity, appellants further argue, the contract must be construed against Nerium as its drafter. *See Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990). Consequently, the trial court should not have enjoined them from recruiting BPs that they had personally sponsored at Nerium.

–22–

Nerium responds that appellants misinterpret the phrase "marketing program" in § 1.16 by equating it with § 11.06's phrase "direct sales, multi-level or network marketing companies." Nerium offers several supporting arguments.

First, the words are different, suggesting different meaning was intended.

Second, interpreting the two phrases to mean the same thing, as appellants suggest, creates a conflict that requires one clause or the other to be rendered meaningless.

Third, the clauses are harmonized by giving "marketing program" in § 1.16 its commonly understood meaning. But as to its third argument, Nerium doesn't offer a plain meaning definition of "marketing program"; at most, it suggests that "marketing program" means "generic network-marketing training."

In their reply brief, appellants argue that a multi-level marketing company is "a distinct type of marketing business model, i.e., a marketing program." They also point out other uses of the word "program" in the Nerium policies and procedures and argue that their context shows that "'marketing program' refers to the multi-level marketing business model."

Nerium's interpretation is a reasonable one, so the trial court did not abuse its discretion by implicitly adopting it when it granted the temporary injunction to maintain the status quo. Several factors make Nerium's interpretation reasonable. To begin, § 1.16 and § 11.06 indisputably use different words, and contracting parties generally mean different things when they use different words. *See PopCap Games, Inc.*, 350 S.W.3d at 708. More importantly, appellants' interpretation would make § 11.06's non-solicitation clause meaningless. Appellants focus on their position that § 1.16 allows them to immediately start recruiting BPs that they personally sponsored at Nerium, but their interpretation also means that § 1.16 lets them start recruiting all other Nerium BPs six months after they quit Nerium. This makes the two-year non-solicitation clause meaningless (and nonsensical), which is an interpretation we should avoid if possible. *See*

*Burlington Res.*, 573 S.W.3d at 203. If we can give "marketing programs" in § 1.16 a different meaning, both clauses can be given effect.

Finally, the canon that specific terms prevail over general terms, *Sefzik*, 231 S.W.3d at 462, lends some support to Nerium's interpretation. The activity in question—recruiting Nerium BPs to join another multi-level marketing company—is clearly and specifically covered by § 11.06. By contrast, § 1.16's terms are somewhat more general, barring appellants "from selling or promoting any competing products or services or marketing programs" to Nerium's BPs. All these factors weigh against interpreting § 1.16 as permitting appellants to recruit Nerium's BPs either immediately or starting six months after appellants left Nerium.

Further, the context of the agreement as a whole supports Nerium's interpretation. Section 1.16's prohibition is much less severe than the two-year prohibition found in § 11.06: § 1.16's prohibition applies for only six months after a BP quits Nerium, and not at all as to BPs that the BP personally sponsored at Nerium. This is consistent with the premise that Nerium is more concerned about former BPs poaching other Nerium BPs than is it about former BPs sharing competitors' products, services, and marketing methodologies with other Nerium BPs.

Although Nerium's interpretation does not on this record clearly answer the question of what "competing . . . marketing programs" means in § 1.16, its burden at this stage of the case is not to show that its interpretation of the agreement is the only reasonable one. Rather, it suffices to hold that Nerium's interpretation is a reasonable one, and that the trial court did not abuse its discretion by adopting that interpretation for purposing of preserving the status quo.

### 3.    Conclusion

Nerium's interpretation of the policies and procedures is reasonable, and the trial court did not abuse its discretion by adopting it when crafting a temporary injunction to preserve the status quo. We reject appellants' third issue.

**D.  Issue Four:  Did the trial court abuse its discretion because Nerium didn't demonstrate, and the temporary injunction doesn't specify, the likelihood of irreparable harm?**

Appellants' fourth issue involves two similar arguments.  First, appellants argue that Nerium failed to demonstrate a likelihood of irreparable harm, which is an essential element of a temporary injunction.  Second, they argue that the temporary injunction itself fails to state how Nerium will be harmed without the injunction, which it must do under Rule 683.

We reject appellants' arguments because (i) the injunction specifies that Nerium will suffer irreparable injury to its relationships with BPs and customers that will be difficult to discover and assess and (ii) Nerium adduced evidence to support that premise.

**1.  Is the injunction specific enough to satisfy Rule 683?**

We address appellants' second argument first, and we conclude that the injunction is specific enough to satisfy Rule 683 because it supplies details about why Nerium would suffer injury if the injunction were not granted, tells appellants why the court issued the injunction, and allows us to review it.

Per the rule, an injunction "shall set forth the reasons for its issuance [and] shall be specific in terms."  TEX. R. CIV. P. 683.  Thus, "a trial court must set out in the temporary injunction order the reasons the court deems it proper to issue the injunction, including the reasons why the applicant will suffer injury if the injunctive relief is not ordered."  *El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 744 (Tex. App.—Dallas 2011, no pet.).  The court should supply enough detail to (i) allow the enjoined party to understand the injunction's basis and evaluate a possible appeal and (ii) provide an adequate basis for appellate review.  *Id*. at 748.  A conclusory statement that the applicant will suffer an irreparable injury for which it has no adequate legal remedy does not suffice.  *Id*. at 747.

Here, the injunction contained the following paragraph regarding Nerium's injury:

Without this injunction, Nerium will suffer a probable, imminent, and irreparable injury in the interim before a final trial on the merits. The non-solicitation covenants protect Nerium's goodwill, confidential information, and other valuable business interests, including by protecting the company's relationship with its salesforce of independent contractors ("Brand Partners") and customers, and information about them. Because Nerium is a direct-sales company, interference with Nerium's relationship with even a single Brand Partner can have damaging effects that extend to a Brand Partner's network of associated Brand Partners and customers, and imminently threaten far-reaching injury that is difficult to discover and fully assess. Once a Brand Partner is directly or indirectly solicited or recruited, their organization can become destabilized, risking the departure of others as well through further recruitment or otherwise.

We conclude that the order is specific enough to satisfy Rule 683. It explains that violations of the non-solicitation clause injure Nerium because (i) interfering with even a single BP can have ripple effects through that BP's associated BPs and customers and (ii) recruiting a BP can destabilize that BP's organization, risking additional BP departures. This is sufficient to allow appellants to understand why the court issued the injunction and to allow us to review it. We have upheld an injunction based on similar statements. *See Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, at *6 (Tex. App.—Dallas Mar. 3, 2016, no pet.) (mem. op.) (upholding injunction that identified harm as "jeopardiz[ing] appellees' confidential information, employment relations, existing and prospective business relationships, reputation and goodwill").

### 2.    Did Nerium adduce some evidence of irreparable injury?

The third element of a temporary injunction is a probable, imminent, and irreparable injury for which there is no adequate remedy at law. *Dass, Inc. v. Smith*, 206 S.W.3d 197, 202 (Tex. App.—Dallas 2006, no pet.). An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as equitable relief. *Id.*

The interruption of business relations can constitute irreparable harm. *Miller*, 2016 WL 836775, at *6. Using confidential information to gain access to customers for a competitor is another recognized ground for injunctive relief. *White v. Impact Floors of Tex., LP*, No. 05-18-

00384-CV, 2018 WL 6616973, at *4 (Tex. App.—Dallas Dec. 18, 2018, no pet.) (mem. op.). Likewise, using confidential information to poach a former employer's salespeople for a competitor is analogous to using confidential customer information because in both cases it is difficult to establish the amount of resulting damages. *See id.*; *see also HMS Holdings Corp. v. Pub. Consulting Grp., Inc.*, No. 05-15-00925-CV, 2016 WL 1179436, at *4 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.) ("Evidence that a former employee possesses confidential information and is in a position to use it against the employer supports the issuance of an injunction.").

Nerium chief marketing officer Amber Rourke testified about the difficulty in proving its injury in this case:

> It's almost impossible to estimate the damages while, first of all, we don't know everyone who quits. They are not required to tell us. They can silently start building a different sales team that we don't know. So that's impossible for us to capture all of the people that have quit and started working somewhere else. There is a lot of intangibles of people who just might not leave and join a different company but they are so confused and have so much turmoil around them that they stop working stop performing, stop working, so we can't capitalize on that. There is just a lot of moving variables that are hard to put an exact dollar amount in terms of when that one person leaves, what is the true impact? Because it's just not in their sales force, we would have to know every single person that left and then every single person they recruited and onward, which has a massive ripple effect down, which is very impossible for us to wrap our hands around.

Rourke agreed that Nerium could determine some of its damages to the extent it knew which BPs quit directly due to appellants' effort, but it could not determine its damages caused by "the ripple effect they created." From this evidence, the trial court could reasonably conclude that a temporary injunction gave Nerium more complete, practical, and efficient relief than would an attempt to calculate damages after the fact. Thus, Nerium's evidence of irreparable injury was sufficient such that the trial court did not abuse its discretion.

Appellants argue that Nerium's irreparable injury claim is rebutted by evidence that Nerium's president said that Nerium's sales and BP recruitment went up after Smith and his wife

–27–

left Nerium. But this evidence is not inconsistent with a finding that Nerium would probably suffer injury if appellants were allowed to solicit Nerium's BPs in the future. That is, there is not necessarily a logical connection between the two concepts. For example, it could be difficult to assess whether Nerium's performance would have been even better with appellant's purported breaches or by how much.

Accordingly, we overrule appellants' fourth issue.

**E.     Issue Five: Did the trial court abuse its discretion because (i) Smith was not a BP subject to the non-solicitation clause and (ii) Nerium approached the court with unclean hands?**

**1.     Did the evidence compel the trial court to conclude that Smith was not a Nerium BP subject to § 11.06?**

Under issue five, appellant Smith asserts that he was not a BP and thus was not subject to the non-solicitation clause. In support, he argues that under Nerium's policies and procedures, a person cannot become a BP without (i) completing a Brand Partner Application and Agreement and (ii) buying a Brand Partner Launch Kit. He claims he never did either. He also argues that Nerium's own pleadings show that he was brought into Nerium at a high level, was given a special title and staff, and was given a "seat at the table" with Nerium's executive team.

Nerium argues, and we agree, that there was evidence that Smith was a BP. That evidence included the following:

- Rourke was asked, "Was Mark Smith a brand partner at Nerium?" She answered, "Yes."

- Rourke was asked, "Did Mr. Smith ever tell you that he had personally confirmed acceptance of the policies and procedures in 2015?" She answered, "Yes."

- Deposition testimony was admitted indicating that Mark and Tammy Smith accepted the policies and procedures on July 7, 2017.

- Smith joined in a motion to dissolve or modify the temporary restraining order that said he was a former Nerium BP. That motion was admitted into evidence at the hearing.

–28–

- A printout of a webpage with the address www.markandtammysmith.com/work-with-us/ showed a button labeled "VISIT OUR BRAND PARTNER WEBSITE."

- Smith testified that he held himself out as a Nerium "diamond international marketing director," which is a BP rank.

Thus, there was some evidence before the trial court that Smith was a Nerium BP and thus subject to the Nerium policies and procedures. Even if Smith introduced conflicting evidence, the trial court did not abuse its discretion by resolving the conflict in Nerium's favor. *See Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.).

2. **Was the trial court required to deny injunctive relief because Nerium had unclean hands?**

Next, appellants argue that the trial court abused its discretion by granting the injunction because Nerium breached its contracts with appellants and therefore came into court with unclean hands.

Even if appellants introduced some evidence that Nerium had unclean hands, we have held that "the trial court does not abuse its discretion in granting the injunction and reserving [defensive] matters to be determined along with the ultimate rights of the parties." *HMS Holdings Corp.*, 2016 WL 1179436, at *3; *see also Keystone Life Ins. Co. v. Mktg. Mgmt., Inc.*, 687 S.W.2d 89, 93 (Tex. App.—Dallas 1985, no writ). Accordingly, we reject appellants' argument.

We overrule appellants' fifth issue.

F. **Issue Six: Does Nerium's tortious interference claim fail because there is no enforceable contract and no enticement to breach any contract?**

In their sixth issue, appellants argue that the temporary injunction could not properly be based on Nerium's tortious interference with contract claims because Nerium failed to show that (i) the non-solicitation clause is likely enforceable and (ii) appellants induced anyone to breach a contract.

Based on our disposition of appellants' first five issues, we affirm the temporary injunction based on Nerium's contract breach claim. Accordingly, we need not and do not address issue six.

## IV. DISPOSITION

For the foregoing reasons, we affirm the trial court's temporary injunction.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE


180617F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARK SMITH, MARK & TAMMY
SMITH, LLC, TEE DANIEL, AND
DARIN KIDD, Appellants

No. 05-18-00617-CV       V.

NERIUM INTERNATIONAL, LLC,
Appellee

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-18-03726.
Opinion delivered by Justice Whitehill.
Justices Molberg and Reichek participating.

In accordance with this Court's opinion of this date, the trial court's temporary injunction is **AFFIRMED**.

It is **ORDERED** that appellee Nerium International, LLC recover its costs of this appeal from appellants Mark Smith, Mark & Tammy Smith, LLC, Tee Daniel, and Darin Kidd.

Judgment entered this 5th day of August, 2019.